**ARMSTRONG, JONES & CO., and Thomas W. Itin, Petitioners,**

v.

**SECURITIES AND EXCHANGE COMMISSION, Respondent.**

**No. 19291.**

United States Court of Appeals
Sixth Circuit.

Jan. 23, 1970.

As Amended Feb. 12, 1970.

**360**

James C. Sargent, New York City, for petitioners, Paxton & Seasongood, Cincinnati, Ohio, Parr, Doherty, Polk & Sargent, New York City, on the brief, James C. Sargent, Robert S. Newman, John M. Hadlock, Jack I. Samet, New York City, of counsel.

Walter P. North, Securities and Exchange Commission, Washington, D. C., for respondent, Philip A. Loomis, Jr., Gen. Counsel, Walter P. North, Assoc. Gen. Counsel, Theodore Sonde, Sp. Counsel, Mark A. Loush, Alan Blank, Attys., Securities and Exchange Commission, Washington, D. C., on the brief.

Before PECK and COMBS, Circuit Judges, and BROWN*, District Judge.

JOHN W. PECK, Circuit Judge.

This case is before the Court on a petition for Review of the Findings and Order of the Securities and Exchange Commission (hereinafter "Commission"). The Commission found that petitioners, Armstrong, Jones & Co. and its president

* Honorable Bailey Brown, Chief Judge, United States District Court for the    Western District of Tennessee, sitting by designation.

and chairman, Thomas W. Itin, violated various sections of the Securities Act of 1933 and the Securities Exchange Act of 1934 and the rules promulgated thereunder. Based upon its finding of violations the Commission ordered the permanent revocation of Armstrong Jones's broker-dealer registration and further ordered Armstrong Jones expelled from the National Association of Securities Dealers. The Commission also ordered that petitioner Itin be barred from association with any broker-dealer with the exception that he could become so associated after one year, subject to a showing of adequate training and supervision.

The Commission found four major violations of the securities laws.[1] The primary issue with respect to each violation is whether there is substantial evidence in the record as a whole to support the Commission's finding. The petitioners also raise issues concerning the appropriateness of the sanctions imposed by the Commission and the alleged denial of certain procedural rights at the hearing. We will deal briefly with each of these issues.

The first violation found was of the securities registration provisions of the Securities Act of 1933. Sections 5(a) and 5(c) of that Act (15 U.S.C. §§ 77e(a), 77e(c)) provide, in substance, that it is unlawful to sell or offer to sell any security unless a registration statement for that security has been filed with the Commission and such registration statement has become effective. However, if the security is part of an issue offered and sold only to residents of a single state, the security is exempt from the registration provisions. 15 U.S.C. § 77c (a) (11). If any of the securities of the issue are sold to or offered for sale to nonresidents of the state, the exemption is lost for the entire issue. Securities Act Release No. 4434 (1961).

■ The Commission found that the petitioners knowingly sold stock of the Alexander Hamilton Life Insurance Company, a Michigan corporation for which they had claimed an intrastate exemption from registration, to nonresidents of Michigan. The Commission based its ultimate finding of a violation on its finding that petitioners either knew or should have known that some of the actual purchasers of the initial offering of the stock were nonresidents of Michigan, and its finding that Itin had actively sought orders for the stock, to be executed immediately after the commencement of trading of the stock, from nonresidents of Michigan. The Commission concluded that petitioners knew or should have known that the exemption from registration for entirely intrastate sales of stock was not applicable to the offering of the Hamilton Life stock, and that therefore the petitioners wilfully violated the securities registration provisions of the Act. Our review of the entire record discloses substantial evidence to support the Commission's findings, and we must therefore affirm the Commission's finding of this violation.

The next violation found by the Commission was of section 17(a) of the Securities Act and sections 10(b) and 15 (c) (1) of the Securities Exchange Act (15 U.S.C. §§ 77q(a), 78j(b) and 78o (c) (1), respectively). The Commission found that the sales manager and various salesmen of Armstrong Jones made predictions about the likelihood of appreciation in value of the Hamilton Life stock without an adequate basis for such predictions, and that they used such predictions to induce customers to purchase the stock, all in violation of the above statutory sections which prohibit the use of fraudulent statements in connection with the sale of any stock.

■ Only petitioner Armstrong Jones is charged with this violation, and it apparently does not seriously dispute that unwarranted and inaccurate price predictions were made. It does contend, however, that the company cannot be found to have wilfully violated the

---

1. The Findings and Opinion of the Commission is reported in Securities Exchange Act Release No. 8420 (1968).

fraudulent representation provisions because of the unauthorized acts of its agents. Petitioner contends that the attribution to it of the employees' wrongful conduct is in essence a finding that it failed to adequately supervise their activity, a separate ground for remedial action under section 15(b) (5) (E) of the Securities Exchange Act. We must disagree. It has long been the position of the Commission that a broker-dealer may be sanctioned for the wilful violations of its agents under the doctrine of *respondeat superior*. See Cady, Roberts & Co., 40 S.E.C. 907, 911 (1961); H. F. Schroeder & Co., 27 S.E.C. 833, 837 (1948). The fact that Congress enacted an additional provision giving the Commission the power to impose a sanction on a broker-dealer for failure to adequately supervise its employees does not limit the Commission's power to discipline a broker-dealer for its employees' acts. Having thus determined that the Commission may properly sanction a broker-dealer for the wilful acts of its agents, and having found substantial evidence in the record as a whole to support the Commission's findings that the Armstrong Jones agents wilfully violated the fraudulent representation provisions of the securities laws, we must affirm the Commission's finding of this violation.

The next violation found by the Commission was that Armstrong Jones, wilfully aided and abetted by Itin, wilfully failed to disclose to the purchasers of the Hamilton Life stock that the Alexander Hamilton Life Insurance Company and Armstrong Jones were under common control. Section 15(c) (1) of the Securities Exchange Act (15 U.S.C. § 78o(c) (1)) and Rule 15c1-5 thereunder require a broker-dealer which is "controlled by, controlling or under common control with, the issuer of any security" to disclose the fact of such common control to any purchaser of such security. Such disclosure may be written or oral, but if oral, written disclosure must also be made at or before the completion of the transaction.

Whether there is common control of a broker-dealer and an issuer of a security is a question of fact to be decided from all the circumstances of each case. Although there is no definition of "control" in the above cited statute or rule, another rule promulgated under the Securities Exchange Act, Rule 12(b)-2 defines control as:

"the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise."

In other analogous circumstances the Commission has held that common control exists whenever "both corporations are controlled by individuals united by several factors tending to create and maintain community of interest among them." J. P. Morgan & Co., 10 S.E.C. 119, 136 (1941).

Applying these principles to the evidence, the Commission found that Armstrong Jones failed to disclose that three individuals, the chairman of the board of directors, and two other directors and officers of Hamilton Life, controlled, together with Itin, Armstrong Jones. Upon review of the entire record, we find substantial evidence to support this factual finding of common control. There remains, however, the question of whether there was a sufficient disclosure of such common control. Petitioners raise several arguments that there was sufficient disclosure of any common control relationship in their various applications to the Securities Commission of the State of Michigan and to the Detroit Stock Exchange. Petitioners also contend that there was a sufficient disclosure by a reference in a Hamilton Life prospectus that Itin was a stockholder of Hamilton Life. Finally, petitioners assert that there was no duty to disclose because any common control relationship which existed was not material. The short answer to these arguments is that there is no requirement in Rule 15c1-5 that any common control

relationship be material, nor is there any provision in the Rule that any disclosure which may have been effected by the petitioners' applications to the Michigan Securities Commission or the Detroit Stock Exchange would relieve the petitioners of the duty under the Rule to give written disclosure of such relationship at or before the consummation of the sale. It is clear that the purpose of the Rule is to insure that customers know of any common control relationship which might affect the broker-dealer's objectivity about the stock. The purpose of the Rule is not served by saying that customers could determine that such a common control relationship existed by making a diligent search of certain public records. The Rule requires the broker-dealer to give written notice *to the customer*. There was no evidence that petitioners gave their customers written notice of common control during the relevant period of time in which the Commission found the common control relationship existed. We must therefore affirm the Commission's finding of this violation.

The final violation found by the Commission was of section 17(a) of the Securities Act and sections 17(a), 10(b) and 15(c) (1) of the Security Exchange Act (15 U.S.C. §§ 77q(a), 78q(a), 78j(b) and 78o(c) (1), respectively), the record keeping and antifraud provisions of the securities laws. The finding of the violation grew out of Armstrong Jones's actions as an underwriter for an offering of stock of Windsor Raceway Holdings Limited (hereinafter "Windsor"). While waiting for the registration statement for the Windsor stock to become effective, Armstrong Jones's salesmen sought indications of interest from potential customers for the Windsor stock, actual sales of the stock being prohibited by section 5(a) of the Securities Act until the registration statement became effective. The effective date of the registration statement for the Windsor stock was delayed beyond the date originally anticipated, and when the registration statement finally did become effective it appeared to petitioners that many of the potential customers for the Windsor stock had lost interest. On the day the registration statement became effective petitioners instructed its salesmen to contact the persons who had given indications of interest to determine whether they still desired to purchase the Windsor stock. However, with knowledge that some of the salesmen had as many as 100 persons to contact, the petitioners directed that confirmations of purchase be sent that same day to all persons who had given indications of interest. The confirmations of sale to many persons were followed up by telegrams stating that unless payment for the stock was immediately forthcoming, the stock would be sold at the market price and the purchaser would be liable to Armstrong Jones for any difference between the purchase price and the market price.

The Commission determined that the indications of interest were not sufficient, without more, to bind the prospective purchasers of the Windsor stock, and that the sending of the confirmations of sale and telegrams without first getting a firm agreement to buy the Windsor stock from the prospective customers was fraudulent and a violation of the above cited statutes and the rules thereunder.

Petitioners do not dispute that such confirmations of sale and telegrams were sent to the persons who had given indications of interest, but they do argue that no further agreement to buy the stock was necessary, the indications of interest being a binding commitment to purchase the stock. The Commission, on the other hand, argues that indications of interest are no more than their name implies, and that they must be transformed into a clear agreement to purchase the stock before a sale is consummated.

There appear to be no cases directed at the narrow issue of whether an indication of interest must be "firmed up" by determining whether the prospective customer still desires to purchase the

**364**

stock before sending a confirmation of sale, but past Commission decisions on other issues have been based on the premise that an indication of interest must be transformed into a firm agreement to buy before there is an effective sale of the security. For example, in Matter of Otis & Co., 35 S.E.C. 650 (1954), the Commission held that a broker-dealer has not sold a security prior to the effective date of the registration statement for the security merely by soliciting indications of interest followed by confirmations of sale immediately upon learning that the registration statement had gone into effect. The rationale of the Commission's decision appears to be that indications of interest, standing alone, are not sufficient to constitute binding commitments to purchase the stock. Matter of Otis & Co., *supra*, at 659–60; see also P. J. Gruber & Co., 38 S.E.C. 171 (1958); I L. Loss, Securities Regulation 215, 224 (2d ed. 1961). The petitioners countered with evidence that the general practice of Detroit securities dealers was to send confirmations of sale to all persons who had given indications of interest without first checking with those persons to determine if they still wanted to buy the stock.

■ However, we need not decide in this case whether, as a matter of law, an indication of interest is the equivalent of a binding commitment to purchase stock or whether an indication of interest must be "firmed up" prior to sending a confirmation of sale. The Commission's finding of a violation in this case was based on a finding that many of the persons who had given indications of interest and to whom confirmations of sale were sent did not in fact agree to purchase the Windsor stock. The Commission found that the indications of interest turned out to in fact indicate widely varying degrees of interest in the Windsor stock. Some of those contacted were actually interested in the stock, some had a slight interest in the stock but did not actually order any stock, and some had no interest in the

stock but did not object to a salesman's suggestion that some stock be "set aside" for them. The Commission found it to be clear that many of the persons solicited by Armstrong Jones did not understand that by expressing some interest in the Windsor stock they were thereby committed to the purchase of that stock. Upon review of the entire record we find substantial evidence to support the Commission's findings, and we therefore affirm the Commission's finding of this violation.

■ We will now deal briefly with the other two issues raised by the petitioners. The first is whether they were denied the right to a fair hearing by reason of the fact that they were denied, prior to the hearing, access to the names and prehearing statements of prospective witnesses against them. Whatever the desirability of such discovery procedures may be, there is no requirement that the Commission furnish a list of all the prospective witnesses' names prior to the hearing. See Dlugash v. SEC, 373 F.2d 107, 110 (2d Cir. 1967). Even under the more stringent conditions which prevail in criminal proceedings under the Jencks Act (18 U.S.C. § 3500) it is only required that a witness' prehearing statement be made available following his direct examination. Thus while the Jencks Act is without present application, it is to be noted that the statements in question were submitted immediately after the testimony in chief of the witnesses in question was received. Furthermore, the Hearing Examiner advised counsel at the beginning of the hearing that they could apply for a continuance at any time they felt they needed more time to examine a witness' prehearing statement. Our examination of the record does not indicate that petitioners were prejudiced by the Commission's rulings with regard to the witnesses' names or statements. We therefore find no basis for the claimed denial of a fair hearing.

■ The final issue raised by the petitioners concerns the appropriateness of the sanctions imposed by the Com-

mission. Petitioner Itin in particular contends that the sanctions imposed on him were too harsh in light of his inexperience, his reliance on the advice of counsel and the loss of income and damage to his reputation which he has already incurred. However, the rule is clear that the determination of the sanctions necessary to protect the public interest rests primarily in the discretion of the Commission. Unless a gross abuse of discretion on the part of the Commission is shown, the Commission's determination of the sanctions necessary to protect the public interest will not be disturbed. See Lawrence v. SEC, 398 F.2d 276, 280 (1st Cir. 1968); Marketlines, Inc. v. SEC, 384 F.2d 264, 267 (2d Cir. 1967), cert. denied, 390 U.S. 947, 88 S.Ct. 1033, 19 L.Ed.2d 1137 (1968); Tager v. SEC, 344 F.2d 5, 8–9 (2d Cir. 1965). While we might have imposed different sanctions had the initial determination in that regard been ours, our review of the record discloses no abuse of discretion on the part of the Commission, and its determination will therefore not be disturbed.

The Commission's order will be affirmed.