SECURITIES AND EXCHANGE COMMISSION, Plaintiff-Appellant,

v.

GEON INDUSTRIES, INC., et al., Defendants-Appellants,

Frank Bloom and Edwards & Hanly, Defendants-Appellees.

Nos. 27,204 and 206, Dockets 74–2614, 74–2657 and 75–7010.

United States Court of Appeals, Second Circuit.

Argued Nov. 28, 1975.

Decided Feb. 9, 1976.

Stanley Sporkin, Washington, D. C. (Lawrence E. Nerheim, Gen. Counsel, Securities and Exchange Commission, Washington, D. C., David Ferber, Sol., Richard E. Nathan, Asst. Gen. Counsel, Washington, D. C., Van P. Carter, Washington, D. C., of counsel), for plaintiff-appellant Securities and Exchange Commission.

Jay G. Strum, New York City (Kaye, Scholer, Fierman, Hays & Handler and Lewis J. Korman, New York City, of counsel), for defendants-appellants Geon Industries, Inc. and George O. Neuwirth and defendant-appellee Frank Bloom.

Delson & Gordon, New York City (Evan L. Gordon, New York City, of counsel), for defendant-appellee Edwards & Hanly.

Before LUMBARD, FRIENDLY and MULLIGAN, Circuit Judges.

FRIENDLY, Circuit Judge:

These appeals from a judgment in an action by the Securities and Exchange Commission (SEC) in the District Court for the Southern District of New York, 381 F.Supp. 1063 (1974), raise some novel questions about liability for "tipping" under Rule 10b–5; about the standard of frankness which a corporate executive is required to observe in answering questions from an exchange on which his company's stock is listed; and about the responsibility of a brokerage firm to police the activities of a registered representative. All these arise in a context where the sole relief sought by the SEC, against those parties who did not consent to judgment, is an injunction.

## I. The Facts

Defendant Geon Industries, Inc. (Geon or the Company), whose principal office is located in Woodbury, Long Island, is primarily engaged in the importation and distribution of repair and replacement parts for imported cars and trucks. It has outstanding approximately 2,000,000 shares of common stock which are listed on the American Stock Exchange (Amex). Defendant George O. Neuwirth was, as the company's name indicates, Geon's founder, chief executive officer, and chairman of its board of directors; he controlled, through direct ownership and a voting trust, some 28% of its stock. Defendant Frank Bloom was its Secretary-Treasurer and Financial Vice President.

In July, 1973, Geon retained Drexel-Burnham & Co. to arrange for discussions concerning a possible merger of Geon and a much larger British company, Burmah Oil Co., Ltd. (Burmah). After some preliminary discussions Burmah requested a forecast from Geon on the future of the automobile replacement parts industry, five-year pro forma income and balance sheet estimates, and an accompanying cash flow projection. Bloom was designated as the liaison officer to prepare and transmit this information. In mid-October Burmah indicated further interest in the company and a desire to pursue its investigation. Since George Neuwirth was planning a trip to England to attend the annual automobile show at Earl's Court, it was decided, in accordance with a suggestion of Bloom's, to have Bloom and George's son, Peter, join him in a visit to Burmah's headquarters. While in England, they apparently also had a preliminary discussion with another English firm interested in Geon; in any case, nothing definite was concluded in the meeting with Burmah's executives.

Before leaving for England, Neuwirth met with Roy Alpert, a friend and business associate in real estate transactions, in the bar of a country club on Long Island, in accordance with a custom whereby the Neuwirths and the Alperts would generally dine together on Wednesday nights. With some other people around, Neuwirth announced that he was going to London and, on being asked why, answered that this was for the auto show "and perhaps looking at some people in view of a merger." [1] Alpert, who previously had owned only 250 shares of Geon, bought 2,600 more shares shortly thereafter, and informed his two brothers of his purchase; they also bought Geon stock.[2]

Marvin Rauch, a registered representative who had been associated with Philips, Appel & Walden, became an employee of Edwards & Hanly (E&H), at its Hewlett, Long Island, office, on August 22, 1973. Neuwirth had first met him at the Geon stockholders' meeting in 1970; Rauch indicated he was selling Geon stock to customers. After moving to E&H's Hewlett office, Rauch began to telephone Neuwirth frequently. Just before Neuwirth left for England, Rauch called him about a report

---

1. This was Neuwirth's version. Alpert's was that "Mr. Neuwirth had mentioned something to the effect that there was an acquisition or a sale taking place in his business."

2. Alpert professed inability to recall whether he had reported Neuwirth's remark to his brothers.

on Geon of which he had heard; Neuwirth told him it was by Coenen & Co. After Neuwirth's return, Rauch resumed calling frequently and pressing Neuwirth to have lunch since Rauch's office was nearby.[3] The lunch was held on November 21; Rauch asked what Neuwirth termed "broker's questions" about Geon, the details of which, and of his answers, Neuwirth could not recall. After the lunch Neuwirth received two bottles of liquor from Rauch. At some time within two weeks of the luncheon, Neuwirth telephoned Rauch at his home, because Rauch's name was among those given by Neuwirth's secretary as having telephoned in his absence. Neuwirth could not recall the details of the conversation but was sure it was not about Burmah.

Between November 2 and December 3, when the first press release about the contemplated merger with Burmah was made, Rauch placed orders for 12,250 shares of Geon: 1,900 were placed in the name of his wife, 600 were placed in the name of Louis Maione but actually were bought for James McMahon, comptroller of a wholly-owned subsidiary of Geon, and 9,750 were for 17 other customers; during the same period he sold only 300 shares, none of which were from his or his wife's accounts. Rosenfeld, the partner of E&H who was manager of

the Hewlett office, bought 575 shares for his wife on November 2 and 5, and Lynn, the assistant manager, between November 2 and December 3, bought 2,700 shares, 650 of which were apparently for himself.

It was not until December 3, 1973, after public rumors had begun to circulate leading to an inquiry by officials of Amex, that Geon issued a press release announcing its preliminary discussions with Burmah. On December 18, the company confirmed that negotiations were continuing, and predicted that a further announcement would shortly follow. It did; on December 20 Geon announced that the companies had reached an agreement in principle whereby Geon was to be acquired by Burmah for $36 million in cash—about $16.80 per share.[4]

Shortly before the second announcement, Neuwirth told Alpert, over the telephone, that he could not attend his own birthday party, planned for December 17, because business commitments would keep him in New York City. Alpert bought 1,000 shares of Geon on or about December 19, as did each of his brothers. At their weekly dinner on Wednesday, February 20, 1974, Neuwirth mentioned to Alpert that Geon's board of directors would meet the next day to "rubber stamp" the contract with Burmah; when Alpert heard nothing from

3. Rauch declined to testify on the ground of self-incrimination. The SEC argues that it should have been allowed to introduce, against Edwards & Hanly, testimony given by Rauch at an SEC investigation held on March 5 and 7, 1974, with only Rauch's counsel present, as an admission by an agent. By the time he appeared before the SEC, Rauch had been placed *on suspension by E&H, and it was clear that* these two potential defendants might have conflicting litigating positions. Whatever the correct rule as to scope of agency for the purpose of receipt of admissions, see Federal Rules of Evidence 801(d)(2)(D) and comment therein, the judge properly declined to receive Rauch's testimony against E&H under these circumstances.

4. Market prices for Geon during the period relevant to this case were as follows:

| Weeks Ending | | High | Low |
|---|---|---|---|
| 9/7/73 | .......... | 12 | 10½ |
| 9/14/73 | .......... | 11⅛ | 10¼ |
| 9/21/73 | .......... | 13⅝ | 11⅛ |
| 9/28/73 | .......... | 13⅞ | 12⅞ |
| 10/5/73 | .......... | 13½ | 11⅞ |
| 10/12/73 | .......... | 13¼ | 11 |
| 10/19/73 | .......... | 14¾ | 11⅜ |
| 10/26/73 | .......... | 14¼ | 13⅛ |
| 11/2/73 | .......... | 13½ | 12⅜ |
| 11/9/73 | .......... | 13⅜ | 12⅝ |
| 11/16/73 | .......... | 12¼ | 9¼ |
| 11/23/73 | .......... | 9¾ | 8¾ |
| 11/30/73 | .......... | 10¾ | 8⅝ |
| 12/7/73 | .......... | 13¾ | 11⅛ |
| 12/14/73 | .......... | 13 | 10¾ |
| 12/21/73 | .......... | 14⅛ | 9⅜ |
| 12/28/73 | .......... | 13⅝ | 12¼ |
| 1/4/74 | .......... | 13⅝ | 12½ |
| 1/11/74 | .......... | 13⅞ | 13⅛ |
| 1/18/74 | .......... | 14⅜ | 13½ |
| 1/25/74 | .......... | 14⅝ | 13¾ |
| 2/1/74 | .......... | 14⅜ | 13⅞ |
| 2/8/74 | .......... | 14¼ | 13¾ |
| 2/15/74 | .......... | 14⅞ | 14 |
| 2/22/74 | .......... | 14⅞ | 11⅞ |

Neuwirth by Friday morning, February 22, he and his brothers sold their Geon stock during the brief period when, as described below, the stock was being traded.

Under the proposed contract Burmah's obligation to purchase was conditioned on Geon's having consolidated net income before taxes, for the year ended December 31, 1973, equal to or in excess of $3,847,000, and on Geon's having a net worth, as of December 31, 1973, equal to or in excess of $14,000,000. In preparation for the board meeting on February 21, 1974, Bloom had instructed his accounting staff to prepare preliminary earnings figures for the year ended December 31, 1973. On the morning of February 21, he learned that a $313,000 intra-company profit item from a previous period had not been reversed, but rather had been improperly reflected in 1973 income—an error which, however, would not by itself have caused Geon's earnings to fall below the stipulated figure.[5] Much more serious was a report to Bloom that branches were coming in with preliminary gross profits which were some $700,000 less than anticipated. These, along with a reported shortfall of $180,000 at the Aviation Export Division, indicated the possibility of a shortfall (apart from the $313,000 error) sufficient to avoid Burmah's obligation to purchase.

For various reasons detailed in the record, Bloom did not believe these preliminary figures were accurate. On arriving at the directors' meeting in New York City, he reported what he had learned during the morning. It was agreed that the meeting should be adjourned until Sunday evening, an interval which Bloom thought would be sufficient for him and his staff, along with Geon's outside accountants, to gain a firmer view of the facts. There was testimony that it was agreed to be of the utmost importance that the entire matter be kept confidential. Also, as Bloom testified, on the recommendation of John A. Friedman

and perhaps also of Lewis J. Korman, both members of the law firm that was Geon's general counsel, it was agreed after the meeting "that the stock should be monitored the next day for any unusual activity, because there's always a concern with the fact that a rumor can get out and that you don't have complete confidentiality."

Bloom returned to Geon's offices and worked with James McMahon and others until after midnight. By ten o'clock they were able to confirm that an error had indeed been made in failing to eliminate $313,000 in intra-company profits. However, they were unable to make meaningful progress with respect to the shortfalls in earnings.

Seemingly McMahon was more convinced than Bloom that the preliminary information was right. After leaving the Geon office he called Rauch in the small hours of the morning and instructed Rauch to sell all of his Geon holdings as well as those in Louis Maione's account. Before trading began on February 22, Rauch advised Rosenfeld that he had 1,500 Geon shares to sell; 1,000 of these shares came from the McMahon and Maione accounts. Rauch, as he had done on other occasions, requested that Rosenfeld phone the order directly to E&H's main order room in New York. This was done.

About the same time Poster, the Amex specialist in Geon, advised Foster, a floor official, that the pre-market activity in Geon was unusual because there were outstanding sell orders for some 10,000 shares. Foster telephoned Randy B. Gromet, a senior Amex listing representative, and they decided to delay the opening of trading in Geon in order to ascertain whether there were any corporate developments that would account for the activity. Gromet immediately telephoned Bloom, whom Geon had designated to receive any such inquiries.

---

**5.** Apparently the contractual figure had been arrived at by projecting various percentages of gross profit at Geon's various warehouses and branch stores. The percentage needed for the east coast warehouse, to which this item relat-

ed, was approximately 36%. Preliminary figures had indicated that this would be some 41%; correction for the error would have reduced it to 37½%. After audit the percentage was determined to be 39%.

Before accepting Gromet's call, Bloom telephoned Friedman and informed him that Gromet was on the phone but that he did not know why. Friedman asked if Bloom knew any more facts; Bloom answered in the negative. Without knowing just what Gromet was about to ask, Friedman advised Bloom to say that Geon had no public announcement to make.[6]

There is a minor conflict over just what then occurred, which the district court did not resolve. There is no dispute that Gromet began by stating there was an imbalance of sell orders in Geon stock. Bloom testified that Gromet also said the imbalance was not large since buyers or arbitrageurs were willing to pick up six to eight thousand of the ten thousand shares being offered for sale. Gromet denied knowing or having said anything about the buy side; however, Foster testified he had told Gromet that arbitrageurs were prepared to buy all the stock offered for sale prior to the opening. Gromet testified that he had accompanied his first remark about the imbalance of sell orders with questions whether there were any corporate developments or any change in the status of the proposed Burmah merger which would account for the sell orders and that Bloom answered both questions in the negative; that Gromet then asked why it had taken so long to reach an agreement with Burmah, to which Bloom responded that it was one thing to have informal discussions and another to iron out a definitive contract; and that Gromet asked again whether anything was pending and Bloom assured him that the company had no announcement to make. Bloom conceded that Gromet had asked him whether there was anything about the Burmah deal that would account for the imbalance of sell orders and that he had answered in the negative;[7] that Gromet had asked about the inordinate amount of time that

had elapsed since Geon's first statement and he had explained this substantially as Gromet said; and that Gromet then asked if Geon had any announcement to make that morning, to which he answered "no, the company has no announcement to make." He added that Gromet then said "Well, I hope you are not going to tell me that you are not making an announcement this morning, but that—and then you will make an announcement this afternoon," to which he answered "the company definitely has no announcement to make today." Following this call, Gromet telephoned Foster to say that there was no information available from Geon that would affect the price of the stock. Foster allowed trading to begin, with 14⅜, down ½ from the previous close, as the opening price.

Before 11:00 a.m., it came to the attention of Mr. Connolly, another member of the firm that was Geon's counsel, that the stock had declined to 13⅞ on heavy volume. After consulting with Friedman and Korman, Connolly called another Amex official, told him of the uncertainty that had developed at the board meeting, and requested that trading be stopped. This was done at 11:19 a. m., by which time the price had fallen to 11⅞ on a volume of 46,000 shares.

On the evening of Sunday, February 24, the Geon board met and learned that the company's earnings would probably fall some $800,000 short of the anticipated figure, and would thus be below the sum stipulated in the Burmah contract. A press release to that effect was issued on Monday morning, February 25. When trading in Geon stock was re-opened on June 10, the price was just under $10 per share. After some discussion about concluding the deal at a lower price, Burmah terminated negotiations in July, 1974.

It remains to describe the considerable activity at the Hewlett office of E&H on

---

6. The paragraph in text follows Bloom's testimony. As Friedman remembered it, Bloom had made an earlier phone call to him, confirming the error in the $313,000 item, and reporting that Bloom "was not very far advanced" in checking out the other possible errors. Bloom did not think there had been an earlier call, and

was uncertain whether he had confirmed the $313,000 error in the call he did remember.

7. Bloom could not recall whether Gromet had made a broader inquiry about "corporate developments."

the morning of February 22. Rosenfeld, who had already handled Rauch's rush order to sell 1,500 shares, learned from Rauch that Geon had not opened at the beginning of trade. Rosenfeld endeavored to ascertain the reason but could find out only that there was an imbalance of orders. When the stock opened on the downside, Rosenfeld took this to be bearish. Before trading was suspended Rosenfeld had sold 1,200 shares of Geon stock in the accounts he managed (including 550 of his own), Lynn had sold 500 share (including 100 of his own), and Rauch had sold an additional 5,700 shares (an order for 1,200 of which was transmitted by Rosenfeld). These included 4,400 shares registered in the name of Mrs. Rauch.[8] Of the 46,000 Geon shares sold during the less than one hour when trading was open, the Hewlett branch of E&H accounted for 8,900.

## II. *The Proceedings in the District Court*

The SEC's complaint, filed on April 2, 1974, named as defendants Geon, Neuwirth, Bloom, McMahon, E&H, Rauch, Roy Alpert and his brother, Irving Alpert. It sought preliminary and final injunctions and "such other and further relief as the Court deems appropriate, including the disgorgement of all illegally obtained benefits." On May 17 the SEC moved for a preliminary injunction. The district court ordered an evidentiary hearing and with the consent of all parties consolidated the hearing with a trial on the merits, F.R.Civ.P. 65(a)(2). McMahon, Rauch, and the Alperts, without admitting or denying the allegations of the complaint, consented to the entry of injunctive orders; no "disgorgement" was directed.

After trial, the district court filed an opinion, 381 F.Supp. 1063 (S.D.N.Y.1974). It found that Neuwirth violated § 10(b) of the Securities Exchange Act and Rule 10b–5 "with respect to the furnishing of material non-public information to Rauch

and Roy Alpert," and that Geon was liable for Neuwirth's delinquencies, 381 F.Supp. at 1068, 1070; accordingly, it granted injunctive relief against Neuwirth and Geon. On the other hand, the court found that Bloom had "acted with reasonable care and prudence," 381 F.Supp. at 1069, and that "the evidence fails to establish that Edwards participated in or knew of Rauch's misconduct or that Edwards did not exercise reasonable supervision over Rauch," 381 F.Supp at 1071; accordingly, it dismissed the complaint against these defendants. Neuwirth and Geon have appealed from the judgments against them, and the SEC has appealed from the dismissal of the complaint against Bloom and E&H. As did the district court, we find it convenient to deal separately with each defendant.

## III. *Neuwirth—Tipper Liability*

Neuwirth's appellate contentions are of two sorts: he argues that there was no evidence that he disclosed any non-public information to Rauch and that the disclosures to Roy Alpert were not material.[9]

The SEC was unable to provide direct evidence of disclosures by Neuwirth to Rauch; Rauch asserted the privilege against self-incrimination and Neuwirth claimed inability to recall the subject-matter of most of their numerous talks. However, inability to reproduce the precise content of conversations under these circumstances cannot be an absolute bar to liability; the circumstantial evidence sufficed to justify the court's inference that Rauch was getting from Neuwirth something that was not available to the public.

Neuwirth did testify he knew that Rauch was actively engaged in selling the company's shares; that Rauch pursued him assiduously, and indeed was the only broker who was calling him; and that he did not tell Rauch to stop the calls until sometime in

---

**8.** It appears that 4,000 of the shares sold by Rauch were purchased by I. Boesky, manager of Edwards & Hanly's arbitrage department, for the firm's own account.

**9.** Neuwirth does not appear to argue that even if he did disclose nonpublic information to Rauch, it was not material. For reasons that will be apparent in our discussion of the two main contentions, such a position could not be successfully maintained.

January, 1974. In addition, he lunched with Rauch alone, something he did with no other broker, accepted two bottles of liquor Rauch sent him following this lunch, and honored one of Rauch's telephone messages by a return call from home. This testimony goes a long way toward supporting the finding that Neuwirth was disclosing non-public information; certainly Rauch was interested in something other than the color of Neuwirth's hair or in getting information available to everyone. The inference that these efforts met with some success is supported by Rauch's placing five purchase orders, totaling 1,100 shares, within a few days after his talk with Neuwirth in mid-October; by his frequent purchases between November 2 and December 3 when the telephoning was going on and the luncheon occurred; and by the near cessation of purchases in January after Neuwirth finally put an end to the telephone calls. Beyond that there is the evidence of Neuwirth's talking too freely to others—his conversation with Roy Alpert before going to England, and his telling Alpert, his two brothers-in-law who were "very substantial stockholders" and perhaps one or two analysts of the upcoming meeting of the directors on February 21 to "rubber stamp" the Burmah deal. Evidently Neuwirth either had not been properly instructed concerning the duty of the chief executive officer of a publicly held company to avoid private disclosure in the brave new world of *Cady, Roberts & Co.,* 40 S.E.C. 907 (1961), and *SEC v. Texas Gulf Sulphur Co.,* 401 F.2d 833 (2 Cir. 1968), *cert. denied sub nom., Coates v. SEC,* 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969), or chose to disregard his instructions. While the inference that Neuwirth communicated inside information to Rauch may not be compelled, it surely was not clear error, F.R.Civ.P. 52(a), for the district judge to have drawn it.

Turning to the issue of materiality, Neuwirth contends with some vigor that the disclosures to Alpert in mid-October could not have been material because the merger with Burmah was in such a embryonic stage that no reasonable man would attach importance to Neuwirth's remarks in deter-mining his choice of action—the language of *List v. Fashion Park, Inc.,* 340 F.2d 457, 462 (2 Cir.), *cert. denied sub nom., List v. Lerner,* 382 U.S. 811, 86 S.Ct. 23, 15 L.Ed.2d 60 (1965), quoted with approval in *SEC v. Texas Gulf Sulphur Co., supra,* 401 F.2d at 849.

That, however, is not the whole of *TGS's* discussion of materiality with respect to acts of insiders and certainly not the end of the doctrinal development on this subject. The *TGS* opinion also cited, 401 F.2d at 849, another passage from *Fashion Park* wherein this court quoted with approval a statement in *Kohler v. Kohler Co.,* 319 F.2d 634, 642 (7 Cir. 1963), that a fact "which in reasonable and objective contemplation *might* affect the value of the corporation's stock or securities" (emphasis supplied in *TGS* opinion) is material.

 More importantly, *TGS* makes clear that not only the probability of an event but also the magnitude of its potential impact on a company's fortunes are relevant to the determination of materiality of inside information, 401 F.2d at 849:

> In each case, then, whether facts are material within Rule 10b–5 when the facts relate to a particular event and are undisclosed by those persons who are knowledgeable thereof will depend at any given time upon a balancing of both the indicated probability that the event will occur and the anticipated magnitude of the event in light of the totality of the company activity.

As we said in *SEC v. Shapiro,* 494 F.2d 1301, 1306 (2 Cir. 1974), another insider case, the application of this test implies that there is "[no] specific rule as to when information respecting a merger becomes material," but rather indicates that each case must be approached on its own facts. Since a merger in which it is bought out is the most important event that can occur in a small corporation's life, to wit, its death, we think that inside information, as regards a merger of this sort, can become material at an earlier stage than would be the case as regards lesser transactions—and this even

though the mortality rate of mergers in such formative stages is doubtless high. In cases of the disclosure of inside information to a favored few, determination of materiality has a different aspect than when the issue is, for example, an inaccuracy in a publicly disseminated press release, see *SEC v. Texas Gulf Sulphur Co., supra,* 401 F.2d at 862, or a proxy statement, see *Gerstle v. Gamble-Skogmo, Inc.,* 478 F.2d 1281, 1301–02 (2 Cir. 1973), and cases there cited; the information takes on an added charge just because it is inside information. Without rehearsing the facts at length, we note that by the middle of October Bloom had more than once specially prepared and transmitted financial information to Burmah; that Burmah seemed to indicate a continuing interest in acquiring Geon; that Bloom recommended that he should accompany the Neuwirths to England; that both Rauch and Alpert demonstrated the importance they attached to the information by purchasing shares in mid-October, compare *SEC v. Texas Gulf Sulphur Co., supra,* 401 F.2d at 851 and *SEC v. Shapiro, supra,* 494 F.2d at 1307; and that Alpert testified that Neuwirth's tip was one of the reasons for his purchase. We think the evidence, and the reasonable inferences that may be drawn from it, support the trial court's determination that the tip to Alpert violated Rule 10b-5. Whether such a violation would support relief more extended than that requested here—an injunction against future misconduct and a "disgorgement" of profits—is a different question.

In holding that the proposed Burmah transaction was sufficiently material that Rule 10b–5 prohibited disclosure by an insider, we would not wish to be understood as saying that a company could be faulted for failing to include a transaction as uncertain as this one was in mid-October in a 10–K or other report to the SEC. Rule 12b–2 under the 1934 Act, like Rule 405 under the 1933 Act, instructs that use of the term "material" to "qualify a requirement for the furnishing of information as to any subject, limits the information required to those matters as to which an average prudent investor ought reasonably to be informed before buying or selling the security registered." This properly recognizes that there are considerations against early disclosure as well as for it. Public disclosure of the Burmah prospect in mid-October would have built up hopes that might prove to be totally unjustified. But as Professor Bromberg has written, while there "may be good reasons to delay disclosure, they do not justify insider trading"— or tipping—"during the waiting period." 2 Securities Law: Fraud, § 7.4(4)(b) at 174 (1975); see also § 7.4(6)(a) at 178–79. Neither does our holding entail the consequence that "the corporation and an insider are prohibited from purchasing stock unless everything that would be in an S–1 registration statement is disclosed to the seller." Jennings and Marsh, Securities Regulation: Cases and Materials 1128 (3d ed. 1972). Our holding is limited to disclosure (or use) of inside knowledge of negotiations with respect to the type of merger which will result in a company's ceasing to exist as such, without implication what other transactions should invoke so severe a rule. In a matter of this sort, however little Neuwirth said to Alpert, and however low its real value may have been in view of the pitfalls ahead, it was more than Rule 10b–5 permits. For an insider in his position silence is indeed golden.

We see no basis for a similar ruling with respect to Neuwirth's mid-December telephone conversation with Alpert. Unfortunately even the majesty of the law cannot prevent the relentless annual recurrence of birthdays of the chief officers of corporations, and we do not see how Neuwirth could have said less than he did. However, we take a different view with respect to Neuwirth's telling Alpert that the Geon board would meet on February 21 to "rubber stamp" the Burmah contract. A meeting of a board of directors to act upon a proposed merger is clearly material; arbitrageurs would regard this as a signal to narrow the price gap. The call for such a meeting should either be kept confidential (with a ban on insider trading or tipping in

the meanwhile) or be publicly disclosed; there can be no justification for leaking the news to a privileged few. If Alpert had made use of the information to purchase additional Geon stock, liability would hardly be questioned. The result should not differ because he combined that information with the lack of a subsequent public (or private) announcement to reach a conclusion that he should sell.

We therefore affirm the district court's findings with respect to Neuwirth's violations. He has not questioned that if the finding of a violation was justified, he was properly subjected to an injunction in the form issued.

### IV. Geon—Corporate Responsibility for Officers' Violations

█ Geon concedes its responsibility for any breach of Rule 10b–5 by Neuwirth with respect to Rauch or, if we should find this, by Bloom, since these were acts by high officers within the scope of their duties. It does deny responsibility for Neuwirth's communications with Alpert, on the ground that these were not within the scope of his office. The SEC responds that any tipping by the chief executive officer of a corporation is necessarily in his official capacity. Although we tend to agree with the SEC, it is unnecessary for us to decide the point in light of our holdings in Part III that Neuwirth violated Rule 10b–5 by talks with Rauch and our holding in Part V with respect to violations by Bloom.[10] Geon also raised no question that, if it was properly held to have violated Rule 10b–5, an injunction in the form issued by the district court was authorized.

### V. Bloom—Failure to Give Full and Fair Answers to Questions From a Stock Exchange

█ We have no occasion to consider what the proper result would have been if Gromet had asked only whether Geon intended to make an announcement on February 22 with respect to the Burmah deal.[11] Gromet did not let it go at that. On Bloom's own testimony Gromet had inquired whether there was anything about the Burmah deal that would account for the large number of sell orders. If Bloom's negative answer was not actually false as it seems to have been, surely it was an omission "to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." Rule 10b–5(2). Bloom had received information which, if verified, would imperil the Burmah deal. He knew also that there was enough concern about the possibility of improper use of this information that counsel had recommended that trading on February 22 should be monitored. Yet, when confronted with the fact that the feared breach of confidence might have transpired,[12] he withheld from the Exhange the facts it needed to make an informed decision whether to suspend trading. Bloom knew also that his answer to Gromet's inquiry about the long delay in concluding the Bur-

---

**10.** Similarly, we have no reason to pass on the SEC's claim that Geon should be held liable for misconduct on the part of McMahon because of the company's "failure to provide adequate safeguards against his misuse of [material non-public] information." See generally Bromberg, Disclosure Programs for Publicly Held Companies—A Practical Guide, 1970 Duke L.J. 1139.

**11.** Rule 12d2–1 authorizes a national securities exchange to suspend trading in a security in accordance with its rules. Article II of the American Stock Exchange Constitution authorizes the Board of Governors to delegate the power "to suspend dealings in such securities at any time, and without notice, when such

action is deemed appropriate." See also the policy statement reproduced in CCH, American Stock Exchange Guide ¶ 10,051 (1975) (suspension possible when any "event shall occur or any condition shall exist which makes further dealings on the Exchange in the security unwarranted").

**12.** Even if Gromet had said, which he denied, that arbitrageurs were willing to pick up six to eight thousand of the ten thousand shares being offered, this would not excuse Bloom's conduct. Bloom must have known that if the arbitrageurs knew what he knew, their offers would melt.

mah deal was not the whole truth. If anything more was required to make him realize the need for greater frankness, it was furnished by Gromet's remark that he hoped that after Geon had said it had no announcement to make that morning, it would not make one in the afternoon. This should have led Bloom to say what he ought to have said earlier, namely, that Geon had encountered a problem; that it did not yet know what the real facts were; and that the board was to meet again on Sunday evening when more information would be available. It is no excuse that Bloom expected that any further release would be made on Monday morning rather than Friday afternoon.

We have no quarrel with the judge's findings, 381 F.Supp. at 1069, that "as of the morning of February 22, Geon had only raw, unverified information, which might have been misleading had it been made public," and that Bloom had a good faith belief that the raw information might prove to be untrue. If the issue here were whether Bloom or Geon violated Rule 10b–5 by failing to issue a public statement on February 22, we would agree they did not; there was too great a danger that such a statement would induce selling that might prove to be unwarranted. We would also decline to find a violation if, in answer to inquiries from stockholders or brokers, Geon had adopted a policy of "no comment." Gromet was not in the position of a stockholder or a registered representative; he was charged with the responsibility of maintaining orderly trading on the exchange on which Geon had listed its shares. Moreover, Bloom's answer to Gromet's pointed queries went considerably beyond "no comment"—an answer that could well have led to action by the Exchange, as Bloom must have known. He denied there was anything about the Burmah deal that would account for the sell orders when he

knew that there well might be. Bloom may indeed have feared that a full and fair answer would have led to suspension of trading and have thought that to be contrary to the best interests of Geon's stockholders. But that decision was confided not to him but to the American Stock Exchange, and the Exchange must be able to rely on officials of listed companies to respond fully and fairly to its inquiries.

We likewise see no sufficient force in the argument that Bloom relied on the advice of counsel. Apart from all else, Bloom could not reasonably have interpreted Friedman as saying that disavowal of an intention to issue a release on February 22 would inevitably be a proper answer no matter what Gromet might ask. Moreover, at the time of their telephone talk, neither Bloom nor Friedman had definite knowledge of the large number of sell orders—although prudence might have suggested to them, particularly in light of the conversation after the board meeting, that something like this had prompted Gromet's call.

We do not mean to minimize that Bloom was in a difficult position. But so were the officials of Texas Gulf Sulphur when confronted with what they regarded as exaggerated rumors about the importance of the drilling at Timmins. If Gromet had asked for the precise details of what had developed, Bloom would have been entitled to respond that he was not yet in a position to say. What he could not do consistently with the securities laws was to give Gromet the impression that all was serene when he knew there was a significant risk of trouble.

We therefore reverse the finding of no violation and remand to the district court to determine whether injunctive relief should be awarded, see *SEC v. Texas Gulf Sulphur Co.*, 312 F.Supp. 77, 87–88 (S.D.N.Y.1970),[13] and, if so, what this should be.

---

13. Since the SEC did not appeal from the district court's denial on remand of an injunction against TGS on equitable grounds, our affirmance, *SEC v. Texas Gulf Sulphur Co.*, 446 F.2d 1301 (2 Cir.), *cert. denied*, 404 U.S. 1005, 92 S.Ct. 561, 30 L.Ed.2d 558 (1971), thus has no precedential value on that point. We do not mean this statement to indicate disagreement with the denial of an injunction.

## VI. *Edwards & Hanly—Adequacy of Supervision*

The trial court dismissed the complaint against E&H, 381 F.Supp. 1071, saying:

> The Court finds that Edwards acted in good faith and that the evidence fails to establish that Edwards participated in or knew of Rauch's misconduct or that Edwards did not exercise reasonable supervision over Rauch. Accordingly, there is no basis for an injunction against Edwards.

The SEC's argument on appeal is that the evidence does show a lack of reasonable supervision, and that, even if it does not, an injunction should issue.[14]

The SEC sets the stage for its claim by pointing to the treatment that Rauch received while at E&H and E&H's knowledge of his activity in Geon stock. As recounted by Rosenfeld, this was as follows: When Rauch came to E&H in August, 1973, Rosenfeld was aware that Rauch held a position of 25,000 to 35,000 shares in Geon for customers and himself and was very familiar with the stock. Under E&H's policies, there had to be "research approval" before Rauch could execute further orders in Geon, since the stock was selling under $15 per share; such approval was quickly obtained. By January 1974, Rauch had become the premier producer at the Hewlett office. Rauch requested and received the privilege of calling orders directly to E&H's main wire room—a privilege accorded to four or five of the twenty registered representatives in the Hewlett office. Regarding Rauch as a comer, Rosenfeld seated him directly in front of the assistant manager, Lynn.

In October, 1973, Rosenfeld began to solicit his customers to purchase Geon stock. Lynn began this in November, as did other registered representatives at the Hewlett office. Allegedly Rosenfeld had no conversations with Rauch about Burmah until after the press releases.

In October, 1973, Rosenfeld received a call from E&H headquarters asking if he was aware of the Hewlett office's growing accumulation of stock in Geon and warning him to be careful. Stronger cautions were issued in late November when the price of the stock had fallen. The fear was of customers' inability to respond to margin calls and that Rauch might be "using special miscellaneous buying power to purchase additional shares of Geon." Rosenfeld told Rauch he would have to see every ticket for the purchase of Geon and recommended that Rauch lighten his position. Despite this, Rosenfeld approved purchase tickets, including purchases on margin. Rosenfeld considered the warnings to be no longer in effect after the possibility of the Burmah deal was announced and the stock had gone up.

The generally favorable treatment accorded to Rauch, however, had no specific causal relationship to Rauch's misconduct,[15] and we must focus more precisely on two points: Should E&H be enjoined for negligently failing to prevent Rauch's contacts with Neuwirth? Should E&H be enjoined for negligently failing to prevent Rauch from selling on inside information on the morning of February 22?

 On the first of these questions, we do not think the evidence would sustain a holding that E&H negligently failed to

14. Relying on *SEC v. Spectrum, Ltd.,* 489 F.2d 535 (2 Cir. 1973), the SEC has also argued this branch of the case, in part, on the theory that E&H should be held liable as an aider and abettor through negligence. That position goes well beyond the facts of *Spectrum;* but we find no need to pass upon the validity of the SEC's theory, since in this context we fail to see what it would add to the claimed violation of a duty reasonably to supervise. For a general discussion of possible differences in other contexts, see Ruder, Multiple Defendants in Securities Law Fraud Cases: Aiding and Abetting, Conspiracy, In Pari Delicto, Indemnification, and Contribution, 120 U.Pa.L.Rev. 597 (1972). See also, Ruder, Factors Determining the Degree of Culpability Necessary for Violation of the Federal Securities Laws In Information Transmission Cases, 32 Wash. & Lee L.Rev. 571 (1975).

15. While the SEC makes much of a certain looseness in procedure with respect to the opening of accounts by Rauch, we also fail to see any but the most attenuated causal relation of this to what occurred.

see to it that Rauch knew of his legal obligations. Rauch was already an experienced broker when hired by E&H, and the SEC made no effort at trial to establish that E&H's compliance manuals, furnished to Rauch, were in any way faulty. The more serious issue is whether E&H should have gone farther and established definite procedures for preventing, or monitoring, contacts between registered representatives and high executives of companies in whose stock the representatives had substantial positions. Rosenfeld's testimony, as it relates to this point, was as follows:

In the fall of 1973 and early winter of 1974, E&H's compliance manual placed no restrictions on a registered representative's calling executives of companies the stocks of which were in personal or company accounts so long as he did not represent himself as Edwards & Hanly, as an investment advisor, or as an analyst, but identified himself only as an account executive. Rauch talked with Rosenfeld about Geon— "Mr. Rauch was tremendously familiar with the company . . . he had a portfolio of information put together, annual reports, any report that was ever written on Geon Industries." Rosenfeld was aware Rauch had spoken to Neuwirth and had been at Geon's plant. All he knew of the content of Rauch's talks with Neuwirth was that on one occasion they had discussed the probable effect of the energy crisis on Geon's business and that on another Rauch had inquired whether there would be a tender offer fee on the Burmah deal after this had been announced.

■ One further point was in evidence. In March, 1974, as a result of the events that here transpired, E&H introduced a new regulation requiring a registered representative to get branch manager approval before he could contact a company whose stock he, or his customers, held. However, the subsequent taking of measures which would have made a violation less likely normally cannot be considered as proving that failure to take them earlier was negligent, see Federal Rules of Evidence 407; *Smyth v. The Upjohn Co.*, 529 F.2d 803 (2 Cir. 1975), in part because "the supposed inference from the act is not the plain and most probable one," 2 Wigmore, Evidence § 283 (3d ed. 1940).[16] The trial court, of course, declined to make the desired inference.

We should also mention one other point. The SEC adduced no evidence, and makes no argument, that it or any stock exchange of which E&H was a member had proposed a prophylactic practice of this sort or that it was common in the industry.[17] Had such a practice existed, we would have expected the SEC to have been zealous in showing it; and, of course, the Commission had the burden of proof. Accordingly, we think that the lack of proof of any specific industry practice that E&H should have followed in order to make Rauch's contacts with Neuwirth less likely argues in its favor and is relevant to the issue of negligence. See Prosser, Torts 166–68 (1971); 2 Harper & James, Torts § 17.3 (1956). We do not mean, of course, that this absence of proof is conclusive, for

> a whole calling may have unduly lagged in the adoption of new and available devices. It never may set its own tests, however persuasive be its usages.

*The T. J. Hooper*, 60 F.2d 737, 740 (2 Cir.) (L. Hand, *J.*), *cert. denied sub nom., Eastern*

---

**16.** The departure from the usual principle that evidence should be admitted if a relevant inference is "fairly possible" is due to the strong policy arguments against consideration of such evidence. *Id.*

**17.** The exchanges seem to have defined member firms' duty of supervision only in the most general language; see Rules 342 and 405 of the New York Stock Exchange; Rules 320 and 411 of the American Stock Exchange. We do know from *SEC v. Lum's, Inc.*, 365 F.Supp. 1046, 1065 (S.D.N.Y.1973), that Lehman Bros., after a similar unfortunate experience with a salesman, imposed a rule forbidding such contacts in February, 1970. However, Judge Tyler held that failure to do this at an earlier date did not constitute "sufficiently negligent conduct to render Lehman directly liable as a participant . . . ." We have no need to determine whether the cumulative experience of that case and this one suffices to put brokerage firms on notice as to the need for a comparable rule in the future.

*Trans. Co. v. Northern Barge Corp.*, 287 U.S. 662, 53 S.Ct. 220, 77 L.Ed. 571 (1932). But what this lack of proof does indicate is that the SEC must argue, in this part of the case, that the standard of supervision for the whole brokerage industry should have been upgraded, not just that E&H ought to have been more careful.

Turning now to the testimony as regards the events of February 22, the issue is somewhat different. On the evidence it is clear that Rosenfeld did nothing to impede Rauch's trading activities; the question is whether Rauch's order to sell 1,500 Geon shares at the opening, and his sales of an additional 5,700 shares before trading ceased, should have led Rosenfeld to make inquiry, rather than to follow Rauch's lead for himself and some of his customers and to permit Lynn to do the same. Rauch had been preponderantly a buyer of Geon stock;[18] Rosenfeld testified that he knew that Rauch had been "exceedingly bullish" as late as February 21, and that he thought that Rauch had 60,000 to 70,000 shares of Geon in his own or his customers' accounts. Rauch's order to sell 1,500 shares from three accounts at the opening on February 22 thus could well have prompted inquiry. However, the evidence is not so overwhelming as the SEC contends. Fifteen hundred shares were only some 2½% of what Rosenfeld thought Rauch's position to be, and the later sales by Rosenfeld, Lynn and Rauch were explicable on the basis of the poor market action of the stock after trading began, especially in view of the small upside potential were the merger to be consummated.

In favor of the SEC's position it may be said that the testimony is susceptible to the interpretation that Rosenfeld was more interested in looking after his own and his clients' interests than in preventing misconduct by his subordinate. Against this is his testimony that his selling activities were motivated solely by his dislike of the market action of the stock; that Rauch conveyed no information to him; and that, indeed, Rauch succeeded in establishing the impression that "quite obviously he knew nothing."[19] Evidently the trial court credited this testimony, or at least the bulk of it.

■ Failure of a firm reasonably to supervise the acts of employees is, of course, a basis for suspension or revocation of the registration of a broker or dealer under § 15(b)(5)(E) of the Securities Exchange Act, subject to the provisos there contained. We assume, although we need not decide, that in an appropriate case the SEC may obtain an injunction where the brokerage firm has breached this duty. See *SEC v. Lum's, Inc.*, 365 F.Supp. 1046, 1064–65 (S.D. N.Y.1973). However, the trial court found no sufficient proof of negligent lack of supervision, and the rule in this circuit is that while a trial judge's finding of negligence or the lack of it is reviewable as a matter of law, "it will ordinarily stand unless the lower court manifests an incorrect conception of the applicable law." *Cleary v. United States Lines Company*, 411 F.2d 1009, 1010 (2 Cir. 1969); *Whelan v. Penn Central Co.*, 503 F.2d 886, 892 (2 Cir. 1974).

We think the evidence suffices to support the trial judge's determination with respect to both branches of the SEC's attack. Concerning Rauch's contacts with Neuwirth, E&H was exercising some supervision in that it required its registered representatives to identify themselves as such. With the benefit of hindsight we can see that the later-established rule, requiring branch manager approval, is a beneficial precaution, but E&H might reasonably have thought that the measures it had required

---

**18.** During the period from October 18, 1973 to February 21, 1974, he had bought 34,850 shares and sold only 1,750. During February, 1974 (prior to February 22), he had bought 2,500 shares, including 1,000 for his wife (on February 19) and sold none.

**19.** As Judge Bonsal noted, when Rosenfeld questioned Rauch as to whether he knew of any reason why the opening of trading in Geon had been delayed, Rauch replied that he did not. 381 F.Supp. at 1071. Rather, he suggested that Rosenfeld call a Mr. Slavin to "see if he could check with the American Stock Exchange."

would be sufficient to alert company executives to the possible dangers, and thus to prevent their disseminating inside information. We thus sustain the holding of the trial judge that the SEC failed to make a sufficient showing that E&H was acting unreasonably, or that it should have been alerted to the need to take further steps before these events came to light.

Rosenfeld's failure to make inquiry on February 22 raises a much closer issue. If the question came before us on review of an order of the SEC entered pursuant to § 15(b)(5)(E) of the Securities Exchange Act or after a finding by the district court of a negligent failure to supervise, we would doubtless sustain the ruling. However there was evidence which, if believed would sustain the trial court's apparent view that Rauch was sufficiently circumspect as not to give Rosenfeld cause for alarm. These credibility determinations were for him to make, and we decline to reverse him on this record.

The judge's citation of *SEC v. Lum's, Inc., supra,* 365 F.Supp. at 1064–65, does not indicate, as the SEC argues, that he held "an incorrect conception of the applicable law." It is true that *Lum's* proceeded in part on the view that a firm in E&H's position could be liable only as a "controlling person" under § 20(a), which rules out liability where the controlling person "acted in good faith and did not directly or indirectly induce the act or acts constituting the violation . . .," and we have since held this view to be erroneous, *SEC v. Management Dynamics, Inc.,* 515 F.2d 801, 811–13 (2 Cir. 1975). However, the judge in *Lum's* was also of the view that lack of good faith and negligent supervision were, in this context, equivalent legal standards, and set as his test, 365 F.Supp. at 1064, that "even in enforcement proceedings . . . there should be at least negligent conduct required before the imposition of liability." The trial court in our case recognized that "good faith" was not a sufficient test, as is shown by the findings below that E&H acted in good faith and also did not fail to exercise reasonable supervision. We think,

therefore, that its determinations as to the adequacy of supervision should be upheld.

 The SEC argues, however, that this is not the end of the matter, *Management Dynamics,* according to the Commission, points in the direction of imposing liability on E&H on the basis of the principle of *respondeat superior* even though E&H did not fail reasonably to supervise. That argument, however, is based on a significant extension of *Management Dynamics,* an extension which, at least in this context, we decline to make.

In *Management Dynamics* the brokerage employee in question was the vice president in charge of trading, and by virtue of his position was able to submit fictitious quotations in the firm's name, thereby creating a misleading appearance of activity in the stock in question. This court was careful to "intimate no view as to other cases which may involve lesser employees," and the opinion was at pains to say that there was no need to decide "whether the entire corpus of agency law is to be imported into the securities acts for all purposes," 515 F.2d at 813. To say that an injunction must issue against a brokerage firm whenever one could have been issued against a registered representative significantly overreads *Management Dynamics.* As the carefully qualified approach of the case makes clear, the fact that use of common law agency concepts may be appropriate in some circumstances does not mean that we should import them where this will not further the policies of the securities acts.

We think there are good reasons for saying that an injunction should not here issue once it has been determined that there was no violation of E&H's duty reasonably to supervise Rauch. While there are circumstances in which the showing required by the SEC to get injunctive relief is less than when other parties are requesting other types of relief, see *SEC v. Texas Gulf Sulphur Co., supra,* 401 F.2d at 868 (Friendly, J., concurring), we do not think that this case falls completely within that category. It is true that courts have used agency principles to impose liability for rescission

or damages on brokerage firms, in suits brought by persons in privity, in circumstances similar to those here present. *Lewis v. Walston & Co.,* 487 F.2d 617, 623–24 (5 Cir. 1973) (sale of unregistered stock, within scope of employment); *Fey v. Walston & Co.,* 493 F.2d 1036, 1051–53 (7 Cir. 1974) (churning); see also *Johns Hopkins University v. Hutton,* 422 F.2d 1124, 1130 (4 Cir. 1970), *cert. denied,* 416 U.S. 916, 94 S.Ct. 1622, 40 L.Ed.2d 118 (1974) (fraudulent misrepresentations). Doubtless in part because of its recognition of such liability, E&H allowed all those who had purchased the shares sold out of the Hewlett office on February 22 to rescind their transactions. But an injunction, in this case, is a different matter.

It cannot be said that, unless an injunction issues, there will be no incentive for brokerage firms to improve their standards for supervising their salesmen; the cases just cited show exactly the opposite. Indeed, even without this judicial remedy, the SEC and the stock exchanges have administrative procedures at their disposal which can be more easily adapted to the introduction of new procedures in the industry as a whole than can injunctive relief in this single case. The need for the injunctive remedy on the facts here present is not pressing.

By contrast, the consequences of an injunction against a brokerage firm are potentially very great. On reasoning parallel to the SEC's contention, an injunction could appropriately be issued that would place the firm in contempt if any other registered representative repeated Rauch's performance, again regardless of the adequacy of supervision.[20] In addition, brokers and dealers face special collateral consequences: the possibility that the injunction will serve as a partial predicate for discipline or revocation under § 15(b)(5)(C) of the Securities Exchange Act; the unavailability of Regulation A, 17 C.F.R. §§ 230.251–63 in cases where the firm is an underwriter; and disqualification under § 9(a)(2) of the Investment Company Act from serving as an employee or official of a registered investment company.[21]

In *Management Dynamics,* the employee held a prominent position in his firm, spoke in his firm's name, and had "apparent authority" to do so. On those facts it was not unfair to enjoin the firm because of his acts. Here, we have only a registered representative, making no special use of his connection with his firm, and with no profit other than ordinary commissions going to it. Given the lack of balance between the need for an injunction and the hardship which it would create, we do not think that one should issue here once it has been determined that E&H exercised reasonable supervision over Rauch. However, we wish to make clear, just as did the court in *Management Dynamics,* that we intimate no view as to cases with different facts, and that

**20.** As we read the relief requested by the SEC below, it would have this effect as regards the purchase or sale of any security. At argument counsel suggested, in answer to a question on this point, that the SEC might be satisfied if the injunction against E&H were limited to future transactions in Geon stock. We suspect that of all injunctions, that would be most unnecessary. As of February 6, 1976, the stock closed at 2⅝ per share.

**21.** While the SEC can lift or waive the latter disabilities, 17 C.F.R. § 230.252 and Investment Company Act § 9(c), there is no assurance that—or when—this would occur.

We note that the SEC in its disciplinary proceedings has taken the position that a brokerage firm may be disciplined for the wilful acts of its employees, under the doctrine of *respondeat superior,* even in the absence of a finding of inadequate supervision, see, *e. g., Cady, Rob-* *erts & Co.,* 40 S.E.C. 907 (1961); this position has been upheld by at least one court, *Armstrong, Jones & Co. v. SEC,* 421 F.2d 359, 361–62 (6 Cir.), *cert. denied,* 398 U.S. 958, 90 S.Ct. 2172, 26 L.Ed.2d 543 (1970). While we have no need to pass upon this, cf. *R. H. Johnson & Co. v. SEC,* 198 F.2d 690 (2 Cir.), *cert. denied,* 344 U.S. 855, 73 S.Ct. 94, 97 L.Ed. 664 (1952), we do note that the Commission has a latitude of response open to it that a court issuing an injunction, in light of the statutory and regulatory consequences we have noted, does not. See *SEC v. Culpepper,* 270 F.2d 241, 252 (2 Cir. 1959); 2 Loss, Securities Regulation at 1326–27. For example in *Cady, Roberts, supra,* although the firm was found in violation of the anti-fraud provisions of the 1933 and 1934 Acts solely on the basis of agency principles, no sanction was imposed.

situations which fall between that case and this one will have to await future resolution. In the end, a court of equity must act in accordance with Mr. Justice Douglas' admonition in *Hecht Co. v. Bowles,* 321 U.S. 321, 329–30, 64 S.Ct. 587, 592, 88 L.Ed. 754 (1944), to which we have so frequently referred:

> The historic injunctive process was designed to deter, not to punish. The essence of equity jurisdiction has been the power of the Chancellor to do equity and to mould each decree to the necessities of the particular case. Flexibility rather than rigidity has distinguished it. The qualities of mercy and practicality have made equity the instrument for nice adjustment and reconciliation between the public interest and private needs as well as between competing private claims.

We therefore affirm the judgments against Neuwirth and Geon, reverse the dismissal of the complaint against Bloom and remand for consideration of the propriety and terms of an injunction, and affirm the dismissal of the complaint against E&H. In view of § 27 of the Securities Exchange Act no costs are awarded.