**SECURITIES AND EXCHANGE COMMISSION, Plaintiff,**

v.

**GEON INDUSTRIES, INC., et al., Defendants.**

**No. 74 Civ. 1496.**

United States District Court, S. D. New York.

Sept. 20, 1974.

---

17. See cases cited above. Cf. Edward Katzinger Co. v. Chicago Metallic Mfg. Co., 329 U.S. 394, 67 S.Ct. 416, 91 L.Ed. 374 (1947).

**1064**

Benjamin Zelermyer, New York City, for defendant Rauch.

Borden & Ball, New York City, for defendants Alpert.

Wallace L. Timmeny, W. Michael Drake, Michael F. Perlis, Richard J. Rubin, Washington, D. C., for plaintiff Securities and Exchange Commission.

Kaye, Scholer, Fierman, Hays & Handler, New York City, for defendants Geon, Neuwirth and Bloom; Jay G. Strum, Lewis J. Korman, New York City, of counsel.

Mark H. Berger, P. C., New York City, for defendant James McMahon.

Delson & Gordon, New York City, for defendant Edwards & Hanly; Evan L. Gordon, New York City, of counsel.

## OPINION

BONSAL, District Judge.

Plaintiff, Securities and Exchange Commission ("SEC"), instituted this action pursuant to section 20(b) of the Securities Act of 1933 ("the Securities Act") (15 U.S.C. § 77t(b)) and section 21(e) of the Securities Exchange Act of 1934 ("the Exchange Act") (15 U.S.C. § 78u(e)) on April 2, 1974, seeking a preliminary and permanent injunction against alleged violations by the defendants of the federal securities laws and the rules promulgated thereunder, as set forth below. The defendants are: Geon Industries, Inc. ("Geon"); George O. Neuwirth, Geon's founder, chief executive officer, Chairman of the Board of Directors, and owner (together with other members of his family) of approximately 28% of the common stock of

Geon; Frank Bloom, Geon's Secretary-Treasurer and Financial Vice President; James McMahon, Comptroller of a wholly-owned Geon subsidiary, Geon Intercontinental, Inc. ("GII"); Edwards & Hanly ("Edwards"), a broker-dealer in securities; Marvin Rauch, a registered representative at Edwards; and Roy and Irving Alpert, partners in a Long Island real estate firm and personal friends of George Neuwirth. Jurisdiction is alleged pursuant to section 22(a) of the Securities Act (15 U.S.C. § 77v(a), and section 27 of the Exchange Act (15 U.S.C. § 78aa).

By Notice of Motion filed on May 17, 1974 the SEC moved for a preliminary injunction to enjoin defendants Geon, Edwards, Neuwirth, Bloom, McMahon, Rauch, and the Alperts from alleged further violations of section 17(a) of the Securities Act (15 U.S.C. § 77q(a)), section 10(b) of the Exchange Act (15 U.S.C. § 78j(b), and Rule 10b–5 (17 C.F.R. § 240.10b–5) promulgated thereunder. The SEC also moved for a preliminary injunction to enjoin defendants Rauch and McMahon from alleged further violations of sections 7(c) and 7(f) of the Exchange Act (15 U.S.C. 78g(c) and (f)), Regulation "T" (12 C.F.R. § 220), and Regulation "X" (12 C.F.R § 224) promulgated thereunder. A hearing was held on June 17, 18, 19, 20, 21, and 27, 1974. Pursuant to an agreement among the parties, the SEC's motion for a preliminary injunction has been deemed consolidated with the SEC's prayer for a permanent injunction. On June 17, 1974 (the first day of the hearing), defendants Rauch, McMahon, Roy Alpert, and Irving Alpert advised the Court that they each would consent to the entry of a permanent injunction against them, and accordingly final judgments of permanent injunctions by consent were entered against McMahon and the Alperts on July 1, 1974 and against Rauch on July 30, 1974. Thus, the only defendants remaining in this action are: Neuwirth, Bloom, Geon, and Edwards.

*The Factual Background*

Geon is a New York corporation with its principal offices located in Woodbury, New York. It is engaged primarily in the business of distributing automobile repair and replacement parts for imported cars and trucks. Its common stock is listed for trading on the American Stock Exchange ("AMEX"); approximately 2 million shares of common stock are outstanding.

In July, 1973 Geon retained Drexel-Burnham & Co. with a view to arranging discussions with Burmah Oil Co., Ltd. ("Burmah") concerning the possible merger of the two companies. Geon's and Burmah's representatives met at various times during August and September. During August, Geon furnished Burmah with a five-year earnings projection and other documentary information.

On October 15, 1973 defendants Neuwirth and Bloom went to London, England to attend an international motor show; during their two-week stay in England, they had meetings with representatives of Burmah's top management. On December 3, 1973 Geon announced that preliminary discussions between Geon and Burmah were under way, and on December 20, 1973 Geon announced that it had reached an agreement in principle with Burmah whereby Geon was to be acquired by Burmah for $36 million in cash (approximately $16.80 per share).

Following this announcement, Geon's and Burmah's representatives and their legal counsel began drafting the purchase agreement. On February 15, 1974, a meeting of Geon's Board of Directors was scheduled for February 21, 1974 for the purpose of obtaining the Board's formal approval of the written agreement. In preparation for the Board meeting, Bloom instructed his accounting staff to compile preliminary earnings figures for the year ended December 31, 1973. Bloom learned on the morning of February 21, 1974 that the reversal of a profit elimination from a

previous period in the amount of $314,000 had been improperly reflected in income for the year 1973. Bloom also learned that preliminary figures indicated (even after correcting the $314,000 error) that Geon would have an earnings shortfall of approximately $800,000 or $900,000 for the year 1973.

At the Board meeting that afternoon, Bloom reported these preliminary figures to the Board of Directors, who deferred action. Bloom was instructed to review the earnings figures and report back to the Board on Sunday evening, February 24, 1974.

After the meeting on February 21, 1974, which was held at the offices of Geon's attorneys in Manhattan, Bloom returned to Geon's offices in Woodbury, Long Island. By 10:30 P.M. he had become certain that the $314,000 item had been improperly included in earnings, and he telephoned Neuwirth to report that to him. At the time he left the offices of Geon (after midnight), however, Bloom was still uncertain about the additional $800,000 or $900,000 shortfall in earnings. Defendant McMahon, who had been working with Bloom, also left the Geon offices after midnight, and later that night he telephoned his broker, defendant Rauch, and instructed him to sell all his Geon holdings. At 8:00 A.M. on February 22, 1974 Rauch telephoned McMahon to confirm the sell order. In that conversation McMahon told Rauch that he wanted out of Geon stock. Shortly after this conversation, a sell order was called in from the Hewlett, Long Island office of Edwards (where Rauch was employed) directly to the floor of the AMEX with respect to all the Geon stock in the accounts of McMahon and McMahon's father-in-law, Louis Maione. Because of an unusually large amount of sell orders, the AMEX floor official with responsibility for supervising the market in Geon stock decided not to open trading in Geon stock

until the company had been contacted to determine if there was an explanation for the large number of sell orders. Randy Gromet (an official at AMEX) telephoned Bloom, who immediately telephoned Geon's attorneys before taking the call from Gromet. Bloom was advised to tell Gromet that Geon had no public announcement to make at that time. Shortly thereafter, at 10:33 A.M. trading opened in Geon stock at 14⅜. Trading continued until 11:19 A.M. when the price fell to 11⅞ on a volume of 46,000 shares.

On Sunday, February 24, 1974 the Board met and learned that in fact there was an approximate $800,000 shortfall in earnings for 1973 at Geon's branches.[1] This was later disclosed to the public by Geon in a press release issued on Monday morning, February 25, 1974. (In July, 1974, according to the press, Burmah terminated its agreement to acquire Geon, and Geon has instituted legal proceedings against Burmah.)

Each of the defendants against whom the SEC seeks an injunction will be considered separately.

## GEORGE O. NEUWIRTH

The SEC contends that during the period prior to December 3, 1973 defendant Neuwirth provided defendants Rauch and Roy Alpert with a "continuous flow of material non-public information regarding the fact and progress of the discussions [with Burmah];" that during January and February of 1974. Neuwirth continued to keep defendants Rauch and Roy Alpert apprised of the progress of the Burmah deal; that the Alperts made two purchases of Geon stock (4625 shares from October 15 to October 18, 1973 and 3000 shares on December 19, 1973) and one sale of Geon stock (8000 shares on February 22, 1974) while in possession of material inside information from defendant Neuwirth. The SEC further contends that

---

1. Geon's divisions and subdivisions are referred to as "individual profit centers." They include the east coast warehouse, the west coast warehouse, the east coast branches, the west coast branches, Geon International Corporation, American Aviation Mfg. Corporation, and Geon G.M.B.H.

defendant Rauch bought and sold Geon stock on numerous occasions from October, 1973 through February 22, 1974 while in possession of material non-public information from Neuwirth.

Neuwirth contends that whatever information was disclosed was not material non-public information within the meaning of the securities laws, but rather only vague, general, and innocuous comments.

At the hearing it was brought out that Neuwirth and Roy Alpert had known each other for about 15 years and that sometime prior to October 15, 1973 they were together in the bar of the Fresh Meadow Country Club, where Neuwirth told Alpert and others that he was going to England to an automobile show "and perhaps looking at some people in view of a merger." Roy Alpert testified that he purchased 2600 shares of Geon stock around October 15, and that this information was one of the reasons for his decision to buy the stock. His only other purchase of Geon stock had been a purchase of 250 shares in 1969 in Geon's initial public offering. Between October 15 and October 18, 1973 Roy Alpert and his two brothers purchased a total of 4625 shares.

The Alperts' next purchase of Geon stock (3000 shares) was made on December 19, 1973. Prior to that, Neuwirth had told Roy Alpert that he could not attend his own birthday party, planned for December 17, because he was staying in New York City and was too busy with his business commitments.

Neuwirth testified that on February 20, 1974 at their weekly dinner with their wives, he mentioned to Alpert that the next day the Geon Board of Directors was going to meet to "rubber stamp" a contract with respect to the Burmah-Geon deal. Alpert testified that he assumed Neuwirth would call him if the deal was going through; Neuwirth testified, however, that there was no discussion of such a plan. In any event, when Alpert heard nothing from Neuwirth by Friday morning, February 22, 1974, he and his brothers decided to sell ½ (or about 4000 shares) of their Geon stock. After that order was executed, the Alperts sold their remaining 4000 shares.

Rauch declined to testify at the hearing, asserting his Fifth Amendment rights. Neuwirth testified that he knew Rauch was a broker and that he was trading in Geon stock. He also testified that Rauch telephoned "rather frequently" and that in November, 1973 Rauch had insisted on having lunch with him. Neuwirth testified that Rauch asked "broker's questions" about Geon though Neuwirth did not recall in detail what those questions were or what answers he gave. After the luncheon meeting Neuwirth received two bottles of liquor from Rauch as a gift. Around November 30, 1973 Neuwirth testified that he telephoned Rauch at his home, though he testified that he did not have the faintest recollection of what was said in that conversation.

As the Court of Appeals recently reiterated in SEC v. Shapiro, 494 F.2d 1301 (2d Cir. 1974):

"Facts are material for purposes of Rule 10b-5 if a 'reasonable investor might have considered them important in the making of [an investment] decision. Affiliated Ute Citizens of Utah v. United States, 406 U.S. 128, 154, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972). See also Mills v. Electric Auto-Lite Co., 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970). Whether facts relating to a future event are material depends 'upon a balancing of both the indicated probability that the event will occur and the anticipated magnitude of the event in light of the totality of the company activity.' SEC v. Texas Gulf Sulphur Co., 401 F.2d 833, 849 (2d Cir. 1968) (en banc), cert. denied, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969)." 494 F.2d at 1305–1306.

In the present case it is significant that the Alperts' purchases or sales all coincided with significant events in the

Burmah-Geon negotiations. At the time of the October purchase Roy Alpert knew that Neuwirth was planning a trip to England to discuss a possible merger or acquisition. It was during this trip that Neuwirth was to meet Burmah's top management personnel concerning the negotiations. The Alperts' purchases in December were immediately prior to Geon's announcement of an agreement in principle with Burmah. The Alperts' sales in February, 1974 occurred the day after Geon's Board had met and failed to approve and announce the signing of the contract with Burmah. Moreover, Neuwirth and Roy Alpert were long-time friends and they had frequent social encounters. Roy Alpert's only purchase of Geon stock prior to the October purchases was in 1969, at the time of Geon's initial public offering, when he purchased only 250 shares. In contrast, the October and December purchases were for much larger amounts and were made almost immediately after conversations with Neuwirth in which Neuwirth's plans and business commitments were mentioned. In each case Roy Alpert also advised his brothers to purchase Geon stock. As the Court of Appeals said in *Shapiro*:

> "In *Texas Gulf Sulphur, supra*, 401 F.2d at 851, the court found this type of evidence [that the alleged tippees purchased substantial amounts of stock after receiving inside information] 'highly pertinent' and 'the only truly objective evidence of the materiality' of the inside information." 494 F.2d at 1307.

On the basis of the foregoing, the Court finds that defendant Neuwirth violated section 10(b) of the Exchange Act and Rule 10b-5 with respect to the furnishing of material non-public information to Rauch and Roy Alpert during the period alleged in the complaint. *See* SEC v. Lum's, Inc., 365 F.Supp. 1046, 1057, 1061 (S.D.N.Y.1973). Since there exists a reasonable likelihood that future violations might occur, the Court finds that the SEC is entitled to the entry of a preliminary and permanent injunction against future violations of the securities laws as to defendant Neuwirth.

### FRANK BLOOM

The SEC contends that defendant Bloom made misrepresentations to Randy Gromet of the AMEX when Gromet telephoned on February 22, 1974 to determine what information Geon might have to explain the large number of sell orders with respect to Geon's stock. The SEC contends that Bloom omitted to tell Gromet of the discovery of the $314,000 error and that Bloom did not disclose to Gromet certain preliminary information which tended to indicate an approximate $800,000 shortfall in Geon's 1973 earnings.

With respect to his conversation with Gromet on February 22, Bloom testified that when Gromet telephoned him, he put him on "hold" and immediately telephoned John Friedman, of the law firm of Kaye, Scholer, Fierman, Hays & Handler (Geon's attorneys). Bloom told Friedman that Gromet was on the other line and that he did not know why Gromet was calling. Friedman asked if Bloom knew anything more about the possible error of $314,000 or the earnings shortfall of $800,000 than he had known the evening before. Bloom said no. Friedman then told him to tell Gromet that Geon had no public announcement to make that day. Bloom then accepted the call from Gromet, who advised him that there was a substantial imbalance of sell orders in Geon stock. During the conversation, Bloom told Gromet that Geon would have no public announcement to make that day.

Gromet testified with respect to the telephone conversation that his first question to Bloom was whether there were any corporate developments which would account for the market activity, or if there was any change in the status of the proposed Burmah merger which would account for the sell orders of the stock. Bloom said that there was no change in the status of the proposed merger transaction and that there were no developments at the company which

would account for the sell orders. After glancing at his Geon file, Gromet asked Bloom why it had taken so long to reach a signed agreement. Bloom responded that it was one thing to have informal discussions and another thing to sit down and iron out a definitive contract. Gromet further testified that he asked Bloom again if anything was pending and Bloom assured him that the company had no announcement to make.

Bloom is a certified public accountant and has been employed by Geon since 1969; he is presently Geon's Financial Vice President.

Toward the end of 1973 Geon anticipated that it would earn approximately $3.8 million before taxes for the year 1973; these figures were furnished to Burmah during the negotiations concerning the possible merger in late 1973 and early 1974. To attain those earnings, Geon had calculated that it would need a gross profit percentage at the east coast warehouse of approximately 36%. During the week preceding the February 21, 1974 meeting, preliminary figures indicated a profit percentage of 41%. When the error in the figures of $314,000 was discovered on the morning of February 21, 1974, this percentage was reduced to 37½%, which was still higher than necessary to meet Geon's anticipated earnings for 1973. When the audit conducted by Geon's independent certified public accountants, Arthur Andersen & Co., was completed in March of 1974 and an audit adjustment of a cutoff error was made, the actual and final gross profit percentage at the east coast warehouse was determined to be 39%.

With respect to the possible $800,000 earnings shortfall, Bloom testified that at first he thought it was "absolutely ridiculous" since Geon had never before experienced a gross profit problem either at the warehouses or at the branches, and also since the running estimates of profits which were kept during the year had given no indication that profits would be so far off. At the time of the conversation with Gromet, Bloom was still uncertain about the accuracy of the figures showing a possible $800,000 earnings shortfall.

 Having heard the testimony of the two witnesses to the conversation, the Court does not find that Bloom violated the securities laws with respect to his conversation with Gromet on February 22, 1974. The evidence brought out at the hearing shows that Bloom acted in good faith and in a careful and reasonable manner in attempting to check the accuracy of the preliminary figures indictating a $314,000 error and the possible $800,000 earnings shortfall. Indeed, final calculations showed that the $314,000 error by itself had no adverse bearing on Geon's ability to meet its anticipated 1973 earnings and to conclude the deal with Burmah since the east coast warehouse's final profit percentage was higher than anticipated, even with the $314,000 error. With respect to the earnings shortfall, when it was determined that Geon would in fact fall short of anticipated earnings, a public statement to that effect was promptly disseminated. However, as of the morning of February 22, Geon had only raw, unverified information, which might have been misleading had it been made public. Moreover, it is significant that Bloom sought and followed the advice of counsel in telling Gromet that Geon would have no public announcement to make on February 22, 1974.

In view of the foregoing, the Court finds that the SEC has failed to show that Bloom was negligent with respect to the statements he made to Gromet on February 22, 1974 or that he violated the securities laws. Since the evidence at the hearing indicates that Bloom acted with reasonable care and prudence, there is no basis for an injunction against him, and accordingly, defendant Bloom is entitled to judgment dismissing the complaint as to him.

### GEON

The SEC contends that Geon is liable and responsible for the acts and alleged

neglects of Neuwirth, its chairman of the Board; Bloom, its Financial Vice President; and McMahon, the comptroller of its major operating subsidiary.

The evidence at the hearing discloses that Neuwirth had frequent conversations with securities analysts and with brokers during the period alleged in the complaint. The evidence also disclosed that Rauch in particular had numerous opportunities for acquiring inside information from Neuwirth, which information he could have used in his trading of Geon stock. There was no evidence that Geon had devised any procedures to prevent the misuse and illegal dissemination of material non-public information.

■ Since a corporation can only act through its officers and directors, the Court finds that Geon is liable here for the violations of its chief executive officer, George Neuwirth. *See* SEC v. *Lum's, Inc.*, 365 F.Supp. 1046 (S.D.N.Y. 1973). See also Affiliated Ute Citizens v. United States, 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972) ; Lanza v. Drexel & Co., 479 F.2d 1277 (2d Cir. 1973). Accordingly, the SEC is entitled to the entry of a judgment granting a preliminary and final injunction against future violations of the securities laws as to defendant Geon.

### EDWARDS

■ The SEC contends that Edwards is liable for the acts of its employee, defendant Rauch, in that Edwards failed properly to supervise his conduct as a registered representative and failed to discover his commission of violations of the securities laws. Edwards, on the other hand, contends that it established procedures which would reasonably be expected to prevent and detect violations by its registered representatives and that it followed those procedures.

Edwards has devised detailed compliance manuals, which its personnel are required to maintain and study. Each registered representative has his own copy of "A Guide for Opening and Managing Accounts for Account Execu-

tives," and classes are held from time to time to review it. When Rauch came to work for Edwards in August, 1973, he had had substantial experience in the securities business as a registered representative at Philips, Appel & Walden, Inc. Mr. Rosenfeld (Manager of the Hewlett office where Rauch was employed) testified that he had checked with the Branch Manager and the Compliance Director at Philips, Appel & Walden about Rauch and had been told that his record was "perfectly clean" and that they would "love to have him back at any time." Nevertheless, like all other new registered representatives, Rauch was given a copy of the registered representative's manual and instructed to become familiar with it. He attended classes given by Mr. Rosenfeld. On at least one occasion while he was at Edwards, Rauch was monitored by three members of the Compliance Staff, who sat with him for up to a half hour and questioned him about his familiarity with the manual and its specific rules.

Before coming to Edwards, Rauch had engaged in trading Geon stock. While at Philips, Appel & Walden he had accumulated in personal and customer accounts around 25,000 to 30,000 shares of Geon stock. Edwards had a policy against solicitation by registered representatives of stocks that were selling for under $15.00; since Geon was selling for under $15.00 when Rauch first came to Edwards, he had to gain approval for solicitations of further orders. Rosenfeld testified that oral approval was obtained when Rauch first began working at Edwards and that written approval followed in October, 1973.

It was brought out at the hearing that some of the information recorded on the account forms with respect to the accounts of McMahon and Maione was not accurate and that the signed account forms were not received by Edwards prior to trading taking place in those accounts. However, Mr. Rosenfeld testified that Edwards relies on the integrity of its registered representatives to obtain necessary information about its cus-

tomers and to see that signed account forms are obtained. Mr. Rosenfeld also testified about his spot checking of the work of the registered representatives and about Edwards' review of those accounts in which there is unusual activity. The evidence indicates that these procedures were thorough and conscientiously applied.

Mr. Rosenfeld testified that he was aware that Rauch made telephone calls to Geon, but he testified that he never knew that Rauch was receiving anything other than general public relations information. Indeed, the only direct evidence that Rauch received and acted upon illegal inside information was the evidence of McMahon's telephone call to Rauch in the early morning of February 22, 1974 and the evidence that later that morning he placed sell orders for all the Geon stock in the accounts of McMahon and Maione. Mr. Rosenfeld testified that he had asked Rauch about why the opening in Geon stock was delayed that morning and that Rauch had answered that he did not know why.

It was brought out at the hearing that on March 4, 1974 Edwards cancelled all trades based on Rauch's inside information. With respect to sales of Geon stock made out of the Hewlett office on February 22, 1974, Edwards cancelled the trades and absorbed 3000 shares into its own error account, which resulted in a loss to Edwards of $12,500 when the stock was later sold. Moreover, when definitive proof of Rauch's wrongdoing was adduced, Edwards promptly discharged Rauch.

In view of the foregoing, the Court finds that Edwards acted in good faith and that the evidence fails to establish that Edwards participated in or knew of Rauch's misconduct or that Edwards did not exercise reasonable supervision over Rauch. Accordingly, there is no basis for an injunction against Edwards, *see* SEC v. Lum's, Inc., *supra* 365 F.Supp. at 1064–1065, and Edwards is entitled to judgment dismissing the complaint as to it.

The foregoing constitutes the Court's findings of fact and conclusions of law. Rule 52(a), Fed.R.Civ.P.

Settle judgment on notice.