**RAYBESTOS–MANHATTAN, INC., Plaintiff,**

v.

**HI–SHEAR INDUSTRIES, INC., Defendant.**

**No. 80 C 2730.**

United States District Court, E. D. New York.

Dec. 16, 1980.

Milbank, Tweed, Hadley & McCloy, New York City (Russell E. Brooks, New York City, of counsel), for plaintiff.

Cahill, Gordon & Reindel, New York City (David R. Hyde, W. Leslie Duffy, Patricia Farren, Joseph W. Muccia, Charles A. Gilman, P. Kevin Castel, New York City, of counsel), for defendant.

## MEMORANDUM AND ORDER

NICKERSON, District Judge.

Plaintiff Raybestos-Manhattan, Inc. ("Raybestos") moves under Rule 65 of the Federal Rules of Civil Procedure for a preliminary injunction enjoining until final adjudication of this action the tender offer of defendant Hi-Shear Industries, Inc. ("Hi-Shear") for 900,000 shares of Raybestos common stock and any further acquisition or voting by defendant of Raybestos common stock. Defendant cross-moves under Rules 12(b)(6), 12(c), and 56 for an order dismissing plaintiff's third amended complaint. The court shall at this time only consider plaintiff's motion for a preliminary injunction. The parties may submit within twenty days additional responses on the motion to dismiss.

Plaintiff is a Connecticut corporation engaged primarily in the manufacture of automotive-related products and fasteners. Defendant, a Delaware corporation with its principal place of business in North Hills, Long Island, New York, manufactures aerospace fasteners and separation fasteners. A.V.C. Corporation ("AVC"), a Delaware corporation, holds 164,248 shares of Raybestos common stock (about 7% of the outstanding) and has an option to purchase

328,488 additional shares (about 14% of the outstanding) exercisable at $28.17 per share until September 8, 1981.

In the fall of 1979 defendant commenced discussions with AVC regarding a possible acquisition of AVC or of the Raybestos common stock and options owned by AVC. During the late spring and summer of 1980 Frederick J. Ross, President and Chief Executive Officer of plaintiff, spoke with David A. Wingate, President and Chief Executive Officer of defendant, regarding defendant's possible acquisition of the Raybestos common stock and options held by AVC. On September 5, 1980 defendant and AVC entered into a written agreement in principle by which AVC would be merged into a subsidiary of defendant.

On September 15, 1980 defendant filed a Schedule 13D with the Securities and Exchange Commission in accordance with Section 13(d) of the Securities Exchange Act, 15 U.S.C. § 78m(d). Schedule 13D requires any person who is "directly or indirectly the beneficial owner" of more than 5 percent of a registered class of stock to file a Schedule 13D within 10 days of such acquisition. In its Schedule 13D defendant revealed that it would acquire 7 percent of Raybestos outstanding common stock and an option to acquire another 14 percent under its agreement in principle with AVC. Defendant also declared that it had purchased 6,000 shares of Raybestos common stock in the open market. Defendant maintained that it intended to hold its Raybestos share "for the purpose of making an investment", and hoped to hold a minimum of 20 percent of outstanding Raybestos shares in order to avail itself of equity accounting treatment. But defendant also added that it "has considered and intends to continue to consider various courses of action with respect to [Raybestos], including (i) the acquisition by Hi-Shear of a significant interest in [Raybestos] through a tender offer, an exchange offer, or otherwise; (ii) proposing a merger or similar transaction between Hi-Shear and [Raybestos]; and (iii) seeking representation on [Raybestos'] Board of Directors."

Between September 25 through October 1, 1980 defendant filed three amendments to its Schedule 13D. The amendments disclosed that defendant had bought additional Raybestos shares on the open market such that its aggregate open market purchases totalled 2.57 percent of Raybestos outstanding common stock. The amendments also revealed that plaintiff had proposed a "standstill agreement" to defendant under which plaintiff would not oppose defendant's acquisition of AVC or its purchase of additional Raybestos shares provided defendant agreed not to obtain more than 22 percent of the outstanding voting securities of plaintiff, not to make an offer to acquire plaintiff by merger or otherwise, and not to participate in any proxy contest relating to the election of plaintiff's directors.

The Schedule 13D amendments also included defendant's response to plaintiff's "standstill agreement"—a counter proposal that would bar defendant from owning more than 30 percent of plaintiff's outstanding voting securities in return for plaintiff's promise not to object to any acquisition up to that amount. The counter proposal was also that both parties negotiate in good faith as to the possibility of a merger if either party requested such negotiations. By its terms the counter proposal would terminate if, after defendant acquired 20 percent of Raybestos outstanding common stock, plaintiff failed to ensure the election to the twelve person Board of Directors of four persons designated by plaintiff, four persons designated by defendant, and four persons approved by both parties though independent of both.

On October 2, 1980 plaintiff filed its initial complaint in this case. The substance of this complaint was included in defendant's fourth Schedule 13D amendment.

Defendant's fifth Schedule 13D amendment revealed that on October 9, 1980 AVC notified defendant that it was considering an alternative offer from another company. It added that on October 13, 1980 AVC agreed to merge into plaintiff. Due to defendant's inability to acquire AVC, it no longer was the beneficial owner of more

than 5 percent of Raybestos outstanding common stock. The termination of defendant's agreement in principle with AVC was reiterated in its sixth Schedule 13D amendment.

On November 17, 1980 defendant, in accordance with Section 14(d) of the Securities Exchange Act, 15 U.S.C. § 78n(d), filed a Schedule 14D-1 with the Securities and Exchange Commission (constituting its seventh Schedule 13D amendment). The Schedule 14D-1 recited that a cash tender offer was being made for the purchase of 900,000 shares of Raybestos common stock at $30 per share. Defendant recognized that acquisition of the requested shares would give defendant 41.3 percent of the outstanding common stock of plaintiff if the merger with AVC were not consummated and 31.1 percent if it were. However, defendant stated that even this reduction in percentage ownership "would not affect its power to control or influence control over the business of [plaintiff]."

On December 10, 1980 defendant amended its Schedule 14D-1 to include an Amendatory Agreement to its Loan Agreement with the four banks helping to finance the tender offer.

■ For this court to issue a preliminary injunction "there must be a showing of possible irreparable injury *and* either (1) probable success on the merits *or* (2) sufficiently serious questions going to the merits to make them a fair ground for litigation *and* a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Caulfield v. Board of Education of City of New York*, 583 F.2d 605, 610 (2d Cir. 1978) (emphasis in original). In deciding whether to grant interlocutory relief the court must balance two conflicting considerations. On one hand, "preliminary injunctive relief is a particularly useful remedy for prevention of probable violations of the disclosure requirements of the Act, for the reason that prior to consummation of the offer the court still has a variety of methods available to it for correction of the misstatements or omissions. But once the tender offer has been consummated it

becomes difficult, and sometimes virtually impossible, for a court to 'unscramble the eggs.'" *Sonesta International Hotels Corp. v. Wellington Associates*, 483 F.2d 247, 250 (2d Cir. 1973) (footnotes omitted). But on the other hand, "interlocutory relief should [not] be given lightly. To the contrary, district judges must be vigilant against resort to the courts on trumped-up or trivial grounds as a means for delaying and thereby defeating legitimate tender offers." *Electronic Specialty Co. v. International Controls Corp.*, 409 F.2d 937, 947 (2d Cir. 1969).

Plaintiff's third amended complaint charges violations of Sections 14(d), 14(e), 13(d), and 10(b) of the Securities Exchange Act (15 U.S.C. §§ 78n(d), 78n(e), 78m(d), and 78j(b)) and Section 7 of the Clayton Act (15 U.S.C. § 18). Allegations relating to each statute will be considered separately.

A. *Alleged Violations of Sections 14(d) and 14(e) of the Securities Exchange Act*

■ Section 14(d) of the Securities Exchange Act imposes obligations on tender offerors regarding disclosure, withdrawal rights of tendering stockholders, and *pro rata* acceptance. 15 U.S.C. § 78n(d)(1), (4), (5), (6). Section 14(e) prohibits fraud in connection with tender offers in language similar to that in Rule 10(b)(5). *Compare* 15 U.S.C. § 78n(e) *with* 17 C.F.R. § 240.-10b-5 (1980). The Securities and Exchange Commission is empowered to formulate rules and regulations prescribing disclosure requirements and means reasonably designed to prevent fraudulent, deceptive or manipulative acts or practices. 15 U.S.C. § 78n(d)(4), (e). Rule 14d-1 and Schedule 14D-1, prescribing the form and contents of the disclosure documents, are the embodiments of this regulatory power. 17 C.F.R. §§ 240.14d-1, 240.14d-100 (1980).

1. *Past Violations of Securities Laws*

Item 2(f) of Schedule 14D-1 requires the tender offeror to disclose:

Whether or not, during the last 5 years, such person was a party to a civil pro-

ceeding of a judicial or administrative body of competent jurisdiction and as a result of such proceeding was or is subject to a judgment, decree or final order enjoining future violations of, or prohibiting activities subject to, federal or state securities laws or finding any violation of such laws; and, if so, identify and describe such proceeding and summarize the terms of such judgment, decree or final order. 17 C.F.R. § 240.14d–100 (1980). According to the "Special Instructions For Complying With Schedule 14D–1," if the tender offer is by a corporation the information requested must be provided with respect to each executive officer, director, and controlling person of the corporation. 17 C.F.R. § 240.14D–100 (1980).

Defendant declared in its Schedule 14D–1 that the only person it knew to be enjoined from future violations of the securities laws or to be found in violation of such laws was George S. Wing, a director of defendant. The pertinent portion of its Schedule 14D–1 reads:

> On November 25, 1975, in an action entitled *Securities and Exchange Commission v. Hi-Shear Corporation and George S. Wing* (USDC, Central District of California No. 74–3717–WPG), Mr. Wing, a director of the Purchaser, without admitting or denying the charging allegations of the complaint, consented to entry of a judgment permanently enjoining him from violation of the proxy rules under the Exchange Act. Hi-Shear Corporation, a California corporation, was merged into the Purchaser in 1977.

However, defendant failed to disclose that Hi-Shear Corporation also consented to the entry of this permanent injunction. Since it is conceded that defendant is bound by this injunction as a successor to Hi-Shear Corporation, this constitutes an omission under the disclosure requirements of Schedule 14D–1. It is not a material omission.

The test of materiality under Section 14 formulated by the Supreme Court in *TSC Industries, Inc. v. Northway, Inc.*, is whether "there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote... It does not require proof of a substantial likelihood that disclosure of the omitted fact would have caused the reasonable investor to change his vote. What the standard does contemplate is a showing of a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder." 426 U.S. 438, 449 (1976); *Seaboard World Airlines, Inc. v. Tiger International, Inc.*, 600 F.2d 355, 360–61 (2d Cir. 1979).

The existence of past securities violations and injunctions may be important to stockholders in deciding whether to tender their shares for two reasons. First, it may put into question the integrity of offeror's management and indirectly raise doubts about the honesty and fairness of the tender offer itself. Second, if the offeror corporation or a corporate official is subject to an injunction, offeror's management may be barred from engaging in certain securities activities that might benefit the target corporation. Target stockholders are unlikely to consider Hi-Shear Corporation's injunction important for either reason.

The acts leading up to Hi-Shear Corporation's injunction occurred six years ago. *See Klaus v. Hi-Shear Corporation*, 528 F.2d 225, 228–29 (9th Cir. 1975). The permanent injunction, dated November 25, 1975, is five years old. Indeed, if defendant had commenced its tender offer nine days later, it would not have been required to disclose the injunction in its Schedule 14D–1. Furthermore, apart from Mr. Wing, the only Hi-Shear Corporation official involved in the questionable securities activities who is currently important in defendant's management is Perry A. Luth, a director. Defendant's current President and Chief Executive Officer, David Wingate, was not affiliated with Hi-Shear Corporation at that time. Given the age of the injunction and the change in management that has occurred since that time, disclosure of the omitted fact is unlikely to affect significantly shareholders' appraisal of the integrity of offeror management.

Nor do the terms of the injunction seriously constrain the activities of defendant. The injunction enjoins George Wing and Hi-Shear Corporation from "engaging in acts and practices which constitute and will constitute violations of Section 14(a) of the Securities and Exchange Act of 1934... and Rules 14a–3, 14a–6, and 14a–9 thereunder...." It adds no obligations to those already imposed by the proxy laws. Consequently, this court finds no substantial likelihood that disclosure of the injunction against Hi-Shear Corporation would have assumed actual significance in the tendering decision of the reasonable shareholder.

Defendant also failed to disclose that in 1976 the Court of Appeals for the Second Circuit held that Frank Bloom—Executive Vice President, Chief Financial Officer, and a director of defendant—had violated Rule 10b–5 in 1974. *Securities and Exchange Commission v. Geon Industries, Inc.*, 531 F.2d 39, 50 (2d Cir. 1976). This holding resulted from a Securities and Exchange Commission proceeding against Geon Industries, Inc.—a corporation unrelated to defendant—and certain of its officers, including Bloom.

On February 22, 1974 officials at the American Stock Exchange noticed unusual pre-market activity in Geon. The opening of trading in Geon was delayed, and Randy Gromet, a senior Amex listing representative, telephoned Bloom to ask whether anything had happened concerning a merger deal that would account for the peculiar activity. The District Court held that Bloom's negative answer was not negligent or in violation of the securities laws. *Securities and Exchange Commission v. Geon Industries, Inc.*, 381 F.Supp. 1063, 1069 (S.D. N.Y.1974). It found that "as of the morning of February 22, Geon had only raw, unverified information, which might have been misleading had it been made public." *Id.* at 1069. The Second Circuit reversed the finding of no violation. *Securities and Exchange Commission v. Geon Industries, Inc.*, 531 F.2d 39, 50 (2d Cir. 1976). Though recognizing that Bloom "was in a difficult position," *Id.* at 50, it found that his response to the Amex official, "[if] not actual-ly false as it seems to have been, [was surely] an omission 'to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.' " *Id.* at 49.

On remand the District Court refused to enter an injunction against Bloom. *Securities and Exchange Commission v. Geon Industries, Inc.*, 74 Civ. 1496 (S.D.N.Y. Sept. 23, 1976). Judge Bonsal declared that "both this Court and the Court of Appeals found that Bloom had a good faith belief that this unverified information might prove to be untrue." *Id.* He did not find that Bloom's action was wilful, blatant, or with intent to defraud. *Id.*

The judgment against Bloom should have been disclosed in defendant's Schedule 14D–1 even though he was not employed by defendant at the time of the violation. Its omission was not material. The judgment is four years old and the violation occurred six years ago. The District Court ruled he was not negligent and on remand found no bad faith. If the District Court had initially found him in violation, the court's judgment would have come down more than five years ago and defendant would have been under no obligation to disclose it. Given the age and circumstances of this securities violation, there is no substantial likelihood that a reasonable stockholder would consider it important in deciding whether to tender his shares.

### 2. *Financing for the Tender Offer*

█ Item 4 of Schedule 14D–1 requires the tender offeror to state the source of funds to be used to purchase the tendered securities. If any part of these funds are expected to be borrowed, the offeror must "[p]rovide a summary of each loan agreement or arrangement containing the identity of the parties, the term, the collateral, the stated and effective interest rates, and other material terms or conditions relative to such loan agreement." 17 C.F.R. § 240.-14d–100 (1980).

Defendant disclosed in its Schedule 14D–1 that $14,500,000 of the $27,000,000 necessary to purchase all the shares requested by the offer would be obtained from available working capital. The Schedule stated that the remaining $12,500,000 would be obtained from bank loans under its Loan Agreement with Bankers Trust Company, Bank of the Southwest, Bank of America, and Union Bank. This loan agreement provides that the lenders would make available to defendant a revolving line of credit of up to $15,000,000 through May 31, 1982 at which time it is convertible at the option of defendant into a term loan payable in 20 equal quarterly installments through May 31, 1987 with the first payment due on August 31, 1982.

On December 10, 1980 defendant disclosed in an amendment to its Schedule 14D–1 that it had agreed in principle with the four lending banks to modify the loan agreement. The modification provides that up to $14,000,000 in additional funds would be made available to defendant solely by Bankers Trust and solely for purposes of the tender offer. This new line of credit is subject to substantially the same terms as under the Loan Agreement except that it will have a maturity of only 24 months.

Plaintiff argues that defendant's Schedule 14D–1 is materially false and misleading because at the time of the tender offer defendant had no committed sources of bank funding. Under Section 5.11 of the Loan Agreement defendant covenants that it will not purchase more than $5,000,000 of the stock of any corporation without the prior written consent of the four banks. When defendant's Schedule 14D–1 was filed on November 17, 1980 only Bankers Trust had waived Section 5.11 in writing. However, since that time the other three banks delivered written waivers—Union Bank on December 2, Bank of America on December 2, and Bank of the Southwest on December 10.

Whether or not the defendant in fact knew on November 17, 1980 that written waivers from all four banks would soon be forthcoming and that the revolving line of credit would be made available, those events have certainly taken place since that time. Defendant did not deceive or mislead target shareholders; it said it could obtain a $12,500,000 line of credit, and it can. No Section 14(d) or 14(e) violation can be found for making an accurate factual statement.

Plaintiff also argues that on November 17 defendant could not borrow $12,500,000 from its $15,000,000 revolving line of credit to purchase tendered securities because at that time it had already borrowed approximately $4,000,000. Defendant admits that only $11,000,000 remained in its line of credit on that date but asserts that at least $1,500,000 of its $4,000,000 loan was retained and was available in its corporate coffers to pay for tendered Raybestos shares. Plaintiff does not contest this assertion. In light of the availability of this $1,500,000 there was no material misstatement.

Finally, plaintiff claims that defendant never intended to borrow the $12,500,000 from the revolving line of credit but planned instead to float a different loan from Bankers Trust. This allegation fails to explain why defendant would conceal its real intentions and why it bothered to obtain written waivers if it intended to finance its tender offer by other means.

But in any event there was no material misstatement. A stockholder would hardly care whether defendant borrows the entire $12,500,000 or only a portion of that amount from Bankers Trust. Except for the shorter maturity and the fact that only one lender is involved, the Bankers Trust loan has substantially the same terms as the revolving line of credit. Furthermore, by borrowing from Bankers Trust defendant leaves the more flexible revolving line of credit available to finance other investments. Rather than indicating defendant's unsuitability to control plaintiff, Bankers Trust's willingness to extend credit to defendant solely for purposes of the tender offer is an indication of defendant's stature in the financial community.

### 3. The Proposed Raybestos-AVC Merger

In its Schedule 14D–1 defendant discusses the history of its dealings with AVC, and describes the negotiations with AVC between November 1979 and September 1980, the agreement in principle to merge of September 5, 1980, the tentative plan to restructure AVC, defendant's intention to effectuate this plan if it wins control of Raybestos and Raybestos merges with AVC, the breakdown of the agreement in principle, and Raybestos' agreement to acquire AVC. As to the proposed merger between Raybestos and AVC, defendant states that it "has not made any determination of whether it would, as a shareholder of the Company or as a holder of proxies to vote Shares of the Company, vote for or against the proposed transaction with AVC when submitted to the Company's shareholders for approval."

Plaintiff contends that these statements are deceptive and omit material facts required to be disclosed. The proposed merger with AVC is a major event in the corporate life of Raybestos and may have a substantial effect on the future market price of its common stock. Defendant's voting decision regarding this merger would be of significant interest to a reasonable shareholder, because if defendant's tender offer succeeds in gaining effective control of Raybestos, defendant's vote will decide the fate of the merger.

Defendant, however, cannot disclose its voting decision if it does not yet know what that decision will be. To do otherwise, however tentatively phrased, would invite target stockholders to rely unjustifiably on mere predictions of future behavior. See Susquehanna Corp. v. Pan American Sulphur Co., 423 F.2d 1075, 1085–86 (5th Cir. 1970). "It would be as serious an infringement of [the S.E.C.] regulations to overstate the definiteness of the plans as to understate them." Electronic Specialty Co. v. International Controls Corp., 409 F.2d 937, 948 (2d Cir. 1969). At the same time a tender offeror has an obligation fairly to disclose its definite plans in the event it takes control of the target corporation.

Susquehanna Corp. v. Pan American Sulphur Co., 423 F.2d at 1085–86.

To sustain its allegation of deception plaintiff bears the burden of showing that defendant had already decided how it will vote on the AVC merger. Plaintiff has not borne that burden.

Plaintiff contends that defendant knows it will vote in opposition to the proposed merger. It points out that defendant has thought a good deal about a merger with AVC because it almost consummated such a merger itself, going as far as obtaining a written agreement in principle to merge. But as defendant's Chief Executive Officer Wingate points out in his deposition, "We had certain plans of how to combine that operation with our own company, and I have no idea how it's going to look when this business is going to be combined either with Raybestos or with Milford Rivet."

Wingate admitted that he found two of the terms in the Raybestos-AVC merger agreement improper because they gave special advantages to certain major shareholders and directors of AVC. Specifically, he believed improper Raybestos' promise to pay $4,500,000 in cash for convertible debentures and AVC stock held by Budd Company, a leading AVC stockholder, and its promise to pay out an AVC director's option values in cash. Yet there is no reason to believe that Wingate's views as to these terms indicate a definite decision to oppose the merger. On the contrary, Wingate contends that he cannot decide how to vote on the AVC merger until he sees the registration statement and learns how the transaction is structured. He also indicates that the last information he has about AVC dates back to July 1980 and that AVC's losses since that time may have exceeded expected projections. In light of this testimony and the absence of more compelling evidence supporting plaintiff's position, this court finds that defendant did not mislead target stockholders by its assertions regarding the proposed AVC merger.

Plaintiff also contends that defendant is obligated to disclose in its Schedule 14D–1 that it will have the determinative vote in

the AVC merger if its tender offer is successful. This contention is without merit. Defendant disclosed in its Schedule 14D–1 that it will own 41.3 percent of Raybestos common stock if it purchases 900,000 shares and that this percentage would constitute effective control. A reasonable shareholder knows that effective control of a company includes the power to determine merger decisions. Disclosure of the fact would add nothing to a stockholder's deliberations regarding this tender offer.

This case is clearly distinguishable in this regard from both *Prudent Real Estate Trust v. Johncamp Realty, Inc.*, 599 F.2d 1140 (2d Cir. 1979) and *Sonesta International Hotels Corp. v. Wellington Associates*, 483 F.2d 247 (2d Cir. 1973). Those cases involved actual misstatements or deception, not the mere recitation of the obvious. In *Prudent Real Estate Trust* the Schedule 14D–1 contained an acknowledged error in stating that the target corporation's existence could be terminated only by a vote of two-thirds of the outstanding shares when in fact it could also be done by a unanimous board of directors. 599 F.2d at 1148. In *Sonesta International Hotels Corp.* the offeror declared that it would abstain from voting on certain important propositions at the target's annual stockholders meeting. 483 F.2d at 252–53. A reasonable shareholder was likely to infer from this statement that the offeror would not affect the result of these votes. The offeror, however, failed to reveal that passage of those proposals required the support of two-thirds of all outstanding shares, so that its abstention, if its tender offer was successful, would in fact guarantee the defeat of those proposals. *Id.*

### 4. *Other Allegedly Material Omissions*

Plaintiff makes certain other claims that defendant has made material omissions in its Schedule 14D–1. All are without merit. Only one deserves discussion.

■ Plaintiff argues that defendant's Schedule 14D–1 should have disclosed Chief Executive Officer Wingate's controlling position, his total domination of defendant's board of directors, the state of his finances, and the ultimate disposition of his stock interest in the event of his death. Plaintiff relies heavily on *Prudent Real Estate Trust v. Johncamp Realty, Inc., supra*, where the Second Circuit held that a tender offer should be preliminarily enjoined in part for failing to disclose any financial information about John Wertin, the president of the offeror. However, in that case Wertin was also the sole stockholder of a corporation that agreed to provide 20 percent of the financing of the tender offer in return for exclusive control of the voting of all tendered shares and management of any property received in respect of such shares. 599 F.2d at 1141–42. Wingate has no such independent personal role in this tender offer.

In addition, the Second Circuit in *Prudent Real Estate Trust* declared that "[a]n important factor here is the impracticability of obtaining information about the Wertin interests from other sources." 599 F.2d at 1148. In contrast, defendant's Schedule 14D–1 refers target shareholders to its proxy statement filed with the Securities and Exchange Commission for information concerning its directors, officers, and principal shareholders and advises them how they may inspect or obtain copies of these statements. Wingate's role with defendant and the extent of his and his wife's shareholdings in the company are disclosed in its August 20, 1980 proxy statement. On the basis of these facts, no material omission can be found.

### 5. *Alleged Failure to Hold the Tender Offer Open for Twenty Business Days*

■ Rule 14e–1 provides in pertinent part:

As a means reasonably designed to prevent fraudulent, deceptive or manipulative acts or practices within the meaning of section 14(e) of the Act, no person who makes a tender offer shall:

(a) Hold such tender offer open for less than twenty business days from the date such tender offer is first published or sent or given to security holders....

This rule is designed to reduce the likelihood of "hasty, ill-considered decision making on the basis of inadequate or incomplete information" by giving target stockholders a reasonable amount of time to consider whether or not to tender their shares. Securities Exchange Act Release No. 16384 (November 29, 1979).

Defendant's tender offer commenced on November 17, 1980 and expires 20 business days later on December 16, 1980. Plaintiff contends, however, that defendant failed to satisfy Rule 14e–1 because the offer was not open during the business days of November 18–21 due to *ex parte* temporary restraining orders obtained by plaintiff from courts in Connecticut and South Carolina.

On November 18 plaintiff filed an action in the Superior Court of Connecticut and requested a temporary restraining order enjoining defendant from continuing with its tender offer until it made the required filing with the Connecticut Banking Commissioner and otherwise complied with the Connecticut Tender Offer Act, Conn.Gen. Stat. §§ 36–456 *et seq.* On November 19 it filed a similar action in the Court of Common Pleas for the State of South Carolina and requested a similar temporary restraining order. Although plaintiff knew the names of defendant's attorneys in both Connecticut and South Carolina it chose to proceed *ex parte.* Temporary restraining orders were issued by both courts and vacated one day later by federal courts to which these actions had been removed. Since that time the South Carolina Tender Offer Disclosure Act has been found unconstitutional, *Hi-Shear Industries v. Campbell*, Civ.No. 80–2211–9 (D.S.C. Dec. 4, 1980), and the Connecticut State Banking Commissioner has been ordered to interpret and apply that state's Act so as to avoid conflict with federal law. *Hi-Shear Industries, Inc. v. Neiditz*, Civ.No. H–80–725 (D.Conn. Dec. 3, 1980).

The Securities and Exchange Commission interprets Rule 14e–1 to forbid an *offeror* from keeping a tender offer open for less than 20 business days by placing conditions upon that offer which delay its opening. S.E.C. Interpretative Release No. 34–16623 (March 5, 1980) (answering question: "Once an offer has commenced, must the offer remain open continuously for 20 business days or may the offer be conditioned in such a way that it will not actually commence until a later date?"). However, in this case the target corporation, not the offeror, sought to delay the opening of the offer. The defendant cannot be held to have violated Rule 14e–1 when the offer was open for less than 20 business days not because of conditions placed on the offer by the defendant but because of injunctive orders requested by the plaintiff. In addition it would be inequitable to enjoin defendant on this ground because it would reward plaintiff's tactic of seeking *ex parte* temporary restraining orders when it easily could have provided prior notice of the hearing to attorneys for the defendant.

### B. Alleged Violations of Section 13(d) of The Securities Exchange Act

Section 13(d) of the Securities Exchange Act imposes disclosure requirements similar to those required by Section 14(d). Section 14(d) requires disclosures of an offeror if upon successful consummation of a tender offer the offeror would be the beneficial owner of more than 5 percent of a corporation's outstanding stock. A person must disclose under Section 13(d) once he has become the beneficial owner of more than 5 percent of the stock. *Compare* 15 U.S.C. § 78m(d) *with* 15 U.S.C. § 78n(d).

Plaintiff alleges that defendant made two material omissions in its Schedule 13D which were not present in its Schedule 14D–1. First, defendant stated in its Schedule 13D filed on September 15, 1980 that its purpose in holding Raybestos stock was "for the purpose of making an investment" when, plaintiff alleges, it intended at that time to acquire effective control of plaintiff. Second, plaintiff claims that defendant failed to reveal that its stock purchases were based on inside information obtained from Raybestos President Ross and the two AVC directors on the Raybestos board.

These alleged omissions were later "cured" in defendant's Schedule 14D–1. There, defendant stated that it sought "to acquire the power to control or influence control" over plaintiff. Also, in the context of describing plaintiff's complaint in this action, it disclosed the material non-public information which defendant allegedly knew and failed to reveal before purchasing Raybestos stock.

■ Assuming *arguendo* that these alleged deficiencies constitute violations of Section 13(d), plaintiff does not show the irreparable injury necessary for injunctive relief in the light of defendant's Schedule 14D–1.

As the Second Circuit declared just four months ago in *Treadway Companies, Inc. v. Care Corporation*:

> The goal of § 13(d) "is to alert the marketplace to every large, rapid aggregation or accumulation of securities . . . which might represent a potential shift in corporate control." *GAF Corp. v. Milstein*, 453 F.2d 709, 717 (2d Cir. 1971), *cert. denied*, 406 U.S. 910, 92 S.Ct. 1611, 31 L.Ed.2d 821 (1972). But as the Supreme Court noted in *Rondeau v. Mosinee Paper Corp.*, 422 U.S. 49, 58, 95 S.Ct. 2069 (1975), "Congress expressly disclaimed an intention to provide a weapon for management to discourage takeover bids or prevent large accumulations of stock which would create the potential for such attempts." *See* S.Rep.No.550, 90th Cong., 1st Sess., 3 (1967); H.R.Rep.No. 1711, 90th Cong., 2d Sess., 4 (1967). Thus, an injunction will issue for a violation of § 13(d) only on a showing of irreparable harm to the interests which that section seeks to protect. *Rondeau v. Mosinee Paper Corp., supra*. Those interests are fully satisfied when the shareholders receive the information required to be filed. *See General Aircraft Corp. v. Lampert*, 556 F.2d 90, 97 (1st Cir. 1977).

*Treadway Companies, Inc. v. Care Corporation*, 638 F.2d 357 at 380 (2d Cir. 1980).

It can hardly be claimed that there is irreparable injury on the theory that the shares purchased by defendant through alleged Section 13(d) violations may help it attain effective control over Raybestos. No irreparable injury was found in *Treadway Companies, Inc.*, and the defendant there purchased on the open market almost one-third of the outstanding shares of plaintiff before it cured deficiencies in its Schedule 13D. *Id.* at 4980. Here, the defendant bought only 2.6 percent of plaintiff's shares before it corrected alleged Schedule 13D errors. *See also Chromalloy American Corp. v. Sun Chemical Corp.*, 611 F.2d 240 (8th Cir. 1979) (defendant found in violation of Section 13(d) after obtaining 10 percent of plaintiff's outstanding stock but correction of misleading Schedule 13D is only injunctive relief).

Furthermore, courts finding Section 13(d) violations have not enjoined defendants from gaining corporate control through tender offers after the Section 13(d) violation has been corrected. *See, e. g., Chromalloy American Corp. v. Sun Chemical Corp., supra; Financial General Bankshares, Inc. v. Lance*, [1978 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 96, 403 at 93,427 (D.D.C.1978) (defendant's acquisition of substantial block of stock while violating Section 13(d) does not warrant enjoining them from acquiring additional stock or from making tender offer). The only situation in which disenfranchisement or divestiture may be permissible remedies for Section 13(d) violations is when the defendant obtains effective control of plaintiff through stock purchases *before* it comes into compliance with Section 13(d). *See Treadway Companies, Inc. v. Care Corporation*, slip. op. at 5016, n.45 (expressly taking no view on the subject). But that situation is certainly not present in this case.

■ Plaintiff tries to avoid the limitations placed upon injunctive remedies under Section 13(d) by arguing that these pretender offer omissions and misstatements also violate Rule 10b–5. Plaintiff, however, is not a defrauded purchaser or seller and thus has no standing to sue under Rule 10b–5. *See Blue Chip Stamps v. Manor*

*Drug Stores,* 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975); *GAF Corporation v. Milstein,* 453 F.2d 709, 721–22 (2d Cir. 1971), *cert. denied,* 406 U.S. 910, 92 S.Ct. 1611, 31 L.Ed.2d 821 (1972). *Cf. Aaron v. Securities and Exchange Commission,* 446 U.S. 680, 691, 100 S.Ct. 1945, 1952, 64 L.Ed.2d 611 (1980) (scienter is element of Rule 10b–5 regardless of nature of relief sought). But even if it did have standing under Rule 10b–5, it would be senseless to allow target management to wield that Rule as a weapon in takeover bids when Congress has enacted Sections 13(d), 14(d), and 14(e) specifically to ensure fairness in battles for corporate control.

## C. *Section 7 of the Clayton Act*

Plaintiff alleges that defendant's attempt to take effective control over Raybestos via its tender offer violates Section 7 of the Clayton Act which provides in pertinent part:

> No corporation engaged in commerce shall acquire, directly or indirectly, the whole or any part of the stock ... of another corporation engaged also in commerce, where in any line of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly." 15 U.S.C. § 18.

The Second Circuit has warned district courts to look skeptically on Clayton Act claims raised by target management who become vigilant enforcers of the antitrust laws only when a tender offer threatens their control. Judge Friendly's opening words in *Missouri Portland Cement Co. v. Cargill, Inc.,* 498 F.2d 851 (2d Cir.), *cert. denied,* 419 U.S. 883, 95 S.Ct. 150, 42 L.Ed.2d 123 (1974), also apply to this case:

> This appeal illustrates the growing practice of companies that have become the target of tender offers to seek shelter under § 7 of the Clayton Act, 15 U.S.C. § 18. Drawing Excalibur from a scabbard where it would doubtless have remained sheathed in the face of a friendly offer, the target company typically hopes

to obtain a temporary injunction which may frustrate the acquisition since the offering company may well decline the expensive gambit of a trial or, if it persists, the long lapse of time could so change conditions that the offer will fail even if, after a full trial and appeal, it should be determined that no antitrust violation has been shown. Such cases require a balancing of public and private interests of various sorts. Where, as here, the acquisition would be neither horizontal nor vertical, there are "strong reasons for not making the prohibitions of section 7 so extensive as to damage seriously the market for capital assets, or so broad as to interfere materially with mergers that are procompetitive in their facilitation of entry and expansion that would otherwise be subject to serious handicaps." These reasons are especially compelling when the target company fails to show that the alleged antitrust violation would expose it to any readily identifiable harm. *Id.* at 854 (footnote omitted).

■ A preliminary injunction under Section 7 of the Clayton Act is not warranted "unless the anti-trust violation was fairly clear or the potential damage to the corporation decisively outweighed that to the would-be acquirer." *Id.* at 870. Plaintiff has not come close to satisfying this standard.

Plaintiff claims that for years it has been developing a plan to enter the aerospace fastener market through its subsidiary Milford Rivet & Machine Company ("Milford"). It insists that it will enter that market if defendant does not take over its operations. Thus, plaintiff claims that it is currently a potential competitor of defendant and would soon become an actual competitor.

■ Courts have considered two theories of potential competition—perceived and actual. The Supreme Court has expressly recognized that acquisition of a perceived potential entrant in an oligopolistic market may violate Section 7. *United States v. Marine Bancorporation, Inc.,* 418 U.S. 602, 624–25, 94 S.Ct. 2856, 2871, 41 L.Ed.2d 978

(1974); *United States v. Siemens Corporation*, 621 F.2d 499, 504 (2d Cir. 1980). To show the probability of a substantial lessening of perceived potential competition, a litigant must prove: (1) that the target market is substantially concentrated, (2) that the acquiring firm has the characteristics, capability, and incentive to make it appear a potential *de novo* entrant, and (3) that "the acquiring firm's premerger presence on the fringe of the target market in fact tempered oligopolistic behavior on the part of existing participants in that market." *United States v. Marine Bancorporation, Inc., supra*, 418 U.S. at 624–625, 94 S.Ct. at 2871.

Plaintiff has presented no evidence that Milford, by waiting in the wings of the aerospace fastener market, has any present effect on that market by constraining oligopolistic excesses for fear of encouraging its entry. *See United States v. Siemens Corporation, supra*, 621 F.2d at 504. Thus, any perceived potential competition argument fails.

The Supreme Court and the Second Circuit have neither accepted nor rejected the actual potential competition theory of Section 7 liability. Under that theory it would be unlawful to acquire a large corporation if: (1) the target market is oligopolistic and (2) "the acquiring firm would be expected to enter the market *de novo* or through a 'toe-hold' acquisition of a firm lacking a significant share of the market." *Id.* at 504, 505. Assuming that preliminary injunctive relief could be based on this theory, plaintiff would need to show no less than a reasonable probability that it would enter the aerospace fastener market in the near future. *Id.* at 506; *BOC International, Ltd. v. Federal Trade Commission*, 557 F.2d 24, 29 (2d Cir. 1977). Since it claims only a lessening of actual competition and not any lessening of perceived potential competition it would probably have to present "clear proof of likelihood of entry." *United States v. Siemens Corp., supra*, 621 F.2d at 506–07, 507 n.7. Plaintiff's evidence not only falls short of the "clear proof" standard but fails even to support a finding of a reasonable probability of entry in the near future.

Plaintiff's subsidiary, Milford, produces general fasteners which are used in a variety of manufacturing operations to fasten one part to another part. General fasteners are manufactured on cold forming machines which, using metal wire as a raw material, form the metal under pressure to a desired shape with dies and punches. About two-thirds of Milford's sales in 1979 came from rivets made to standard commercial specifications. The remainder came from custom-engineered cold formed components in which product specifications were supplied by the customer. Milford at this time produces no aerospace fasteners.

Plaintiff contends that Milford has taken substantial steps to enter the aerospace fastener market. In 1973 it purchased Farrel Products, a plant in the heart of Southern California's aerospace industry, which manufactures tooling for the aerospace fastener manufacturing industry. One year later it began construction of a new plant adjacent to Farrel capable of manufacturing both aerospace and standard commercial fasteners. In 1978 and again in 1980 Milford formally declared its goal of entering the aerospace fastener market in its Management Action Planning System. Early in 1980 it hired a man with previous experience in the production and sale of components used in government missile systems as Division Manager of its Western Division. Subsequently, it authorized its Product Manager to get major aircraft manufacturers to certify Milford as an aerospace fastener supplier. It has begun to gather the information needed to apply for such certification. It has also submitted an application to the General Services Administration to be placed on its bidders mailing list.

These steps indicate only that plaintiff has made an equivocal, faltering start towards possible entry into the aerospace fastener market. It does not indicate that plaintiff has made significant strides in overcoming the substantial barriers to entry that it admits exist in the aerospace fastener industry.

Aerospace fasteners apparently must meet exacting specifications to withstand temperature extremes, stress, vibration, and force, and must also survive rigid quality controls. Aircraft manufacturers are so concerned about the quality of the aerospace fasteners they purchase that they certify all suppliers. Defendant asserts that unless an aerospace fastener manufacturer has stringent quality control procedures and the facilities to perform sophisticated testing, its products will not win certification.

As of December 5, 1980 Milford had not yet submitted applications for certification from aircraft manufacturers. Nor has it taken any concrete steps to upgrade its quality control system to the level said to be required of aerospace fasteners. Milford has not yet begun to gather the engineering expertise in research and development and applications engineering that it admits are necessary in order to design products to the exacting specifications of aerospace manufacturers. Nor has it made the necessary efforts to build a sales force composed of sales engineers with the technical expertise to meet the special needs of aerospace customers. Finally, Milford has not obtained the patent licenses it will need to enter the aerospace fastener market given the absence of any research and development effort.

A memorandum written on October 16, 1980 from Edward Filadelphia, Product Manager of Milford's Western Division, to Fred Bauce, Milford's President, indicates the speculative nature of plaintiff's potential entry into the aerospace fastener market. That memorandum describes the detailed information that must be provided and the arduous criteria that must be met before Milford can qualify for certification as an aerospace prime contractor. It also suggests an alternative method of entering the aerospace fastener market—selling to aerospace approved suppliers. "This approach could allow us to rely somewhat on their quality assurance programs and could be a learning experience for us in the aerospace field." The memorandum ends:

Fred, I hope this memo and the enclosed information will shed some light on the aerospace mystery, it really turns out to be a great deal of research and a lot of work, but I think it will be worthwhile, if nothing else it will give us a bases (sic) for a decision. After our survey and audit we *will* know exactly what we need to do and which direction to go." (emphasis in original).

Furthermore, even if Milford should enter the aerospace fastener market in the near future it would not enter on a scale large enough to have a significant impact on competition. Milford's total sales in 1979 were just $19,583,000. In contrast, Hi-Shear's Aerospace Fasteners and Systems Division, with a market share of approximately 10 percent, earned $41,965,000 in revenues in 1979. Milford's capital expenditures budget over the next two years is only $2,000,000, and all of this money is certainly not earmarked for entry into the aerospace fasteners market. In addition, as the memorandum indicates, it may not even enter the aerospace fastener industry as a prime contractor but instead may merely sell to prime contractors.

This court finds that plaintiff has not made a showing of probable success on its Clayton Act claim or presented sufficiently serious questions going to the merits to make them a fair ground for litigation. Furthermore, the balance of hardships does not tip decidedly towards plaintiff; enjoining the tender offer pending litigation of its antitrust claim may well kill defendant's takeover bid. A preliminary injunction under these circumstances would serve the purposes of plaintiff's management, not the purposes of the antitrust laws.

*Conclusion*

Probably there will no more be a perfect tender offer than a perfect trial. Congress intended to assure basic honesty and fair dealing; not to impose an unrealistic requirement of laboratory conditions that might make the [Williams Act] a potent tool for incumbent management to protect its own interests against the desires and welfare of the stockholders.

These considerations bear on the kind of judgment to be applied in testing conduct—of both sides—and also on the issue of materiality. *Electronic Specialty Co. v. International Controls Corp.*, 409 F.2d 937, 948 (2d Cir. 1969).

This is not a perfect tender offer. The Williams Act does not require perfection. It seeks only "to make the relevant facts known so that shareholders have a fair opportunity to make their decision." H.Rep.No.1711, 90th Cong., 2d Sess., *reprinted in* 2 U.S.Code Cong. & Ad.News, pp. 2811, 2813 (1968). This tender offer provides that fair opportunity. To enjoin its consummation on the basis of immaterial omissions would injure rather than benefit target stockholders. Plaintiff's motion for a preliminary injunction is denied. So ordered.